SHAD ALLIANCE et al., Respondents, v SMITH HAVEN MALL,
Appellant.

Second Department, February 4, 1985

### APPEARANCES OF COUNSEL

*Paul, Weiss, Rifkind, Wharton & Garrison* (*Robert S. Smith, Matthew E. Fishbein* and *Audrey S. Feinberg* of counsel), for appellant.

*Steven R. Shapiro* and *Christopher A. Hansen* for respondents.

*Stroock & Stroock & Lavan* (*Edward R. Korman* and *Naomi Siegel* of counsel), for the New York Government Affairs Committee of the International Council of Shopping Centers, *amicus curiae.*

## OPINION OF THE COURT

Brown, J.

The issue to be decided on this appeal is whether the rights of free speech and petition under our State Constitution (NY Const, art I, §§ 8, 9) protect those who wish to distribute leaflets dealing with matters of public interest and concern at a large, privately owned suburban shopping mall. We conclude that the shopping mall in question — the Smith Haven Mall in Suffolk County — by virtue of its size, location and mode of operation, has undertaken the character and attributes of a downtown business district or town center such that the rights of free expression under our State Constitution require that the mall be enjoined from prohibiting the distribution of leaflets on its premises, subject only to the adoption of reasonable regulations as to the time, place and manner in which such activities may be carried out so as to minimize any interference with the mall's commercial functions.

SHAD Alliance (Sound-Hudson Against Atomic Development) is a coalition of organizations from New York City, Long Island, Westchester and the Mid-Hudson area opposed to the use of nuclear power. It seeks to prevent the operation of existing nuclear power plants and the completion of new ones through educational means and nonviolent action. Paumanok People's Organization has been formed, in its own words, in opposition to "the use of nuclear power for the generation of electricity and the manufacture and use of nuclear weaponry". It favors the use of "safe, renewable and decentralized services of energy" and seeks to promote its goals through "non-violent direct action". On two occasions during the summer of 1980, representatives of the two groups, including on one occasion both of the individual plaintiffs, stood under the portico at the main entrance to the Smith Haven Mall and began distributing leaflets which expressed their opposition to the use of nuclear power and encouraged the public to protest against the operation of the Shoreham Nuclear Power Station. On each occasion, representatives of the mall ordered the plaintiffs to desist in their activities, based upon a policy which prohibits the distribution of leaflets without the permission of the mall's management. When such permission was thereafter sought, it was denied.

Special Term, after finding that the plaintiffs' activities did not in any manner disturb the mall's operation, concluded, *inter alia,* that the "Mall * * * can be considered to perform the functional equivalent of a town center and the free flow and

dissemination of all ideas would be severely curtailed if plaintiffs were denied access to it" (*SHAD Alliance v Smith Haven Mall,* 118 Misc 2d 841, 848). It held that under our State Constitution plaintiffs were required to be allowed access to the mall to communicate their ideas. We agree.

The Smith Haven Mall is a large, privately owned and operated shopping center occupying approximately 97 acres, and containing parking for 7,000 cars. It is owned by the Prudential Insurance Company of America and is operated by a privately owned management company. The mall building itself contains about 1.4 million square feet and is occupied by three large "anchor" department stores (Abraham and Straus, Macy's and Sears) and approximately 125 other retail establishments, including several restaurants and banks, a movie theatre, a dental clinic and social services agency. The mall is protected by both the Suffolk County Police Department and a private security force. Its 1977 annual gross sales of $180 million comprised nearly 5% of all retail sales in Suffolk County, making it the county's largest retail center. According to a 1979 public relations survey, the mall draws customers from over 60 surrounding areas; nearly one half of its customers do not regularly shop at any other shopping center and an equal number visit the mall at least once each week.

The mall is typical of any large suburban shopping center, and is designed to encourage the public to linger and congregate. At the center of the mall, where its four pedestrian walkways converge, there is a shallow sunken amphitheatre designed to seat a large number of people. The amphitheatre is surrounded by a number of take-out food establishments and seating areas where shoppers and other visitors are encouraged to sit and relax. There are similar facilities at the ends of the corridors leading to the three anchor department stores.

The mall also serves as the focal point for a number of community activities and gatherings, hosting over 80 promotional events each year, including exhibitions, charity auctions, recruitment efforts by both local universities and the Armed Forces, and free health-related services. In addition, the mall permits the use of its facilities for annual voter registration drives and promotional events by local towns and provides space for the mobile office of the local member of Congress. As a matter of policy, however, the management of the mall has prohibited any type of pamphleting or use of its facilities for campaigning or political gatherings.

Our analysis of the issues begins with an acknowledgment of the proposition that leafleting at any privately owned shopping center — no matter of what size or character — is not a protected activity under the 1st Amendment of the Federal Constitution. In *Lloyd Corp. v Tanner* (407 US 551), the United States Supreme Court expressly held that a privately owned shopping center's policy of prohibiting the distribution of handbills on its premises was not violative of the rights of free speech and assembly under the United States Constitution. Noting that the 1st and 14th Amendments safeguard the rights of free speech and assembly against the infringement by the government — and not against the actions of private individuals — the court stated that property does not "lose its private character merely because the public is generally invited to use it for designated purposes" (*Lloyd Corp. v Tanner, supra,* p 569). Specifically rejected by the majority in *Lloyd* was the contention that where a shopping center takes on the characteristics of a downtown business district, it is considered to have been dedicated for public use and, as a consequence, all members of the public, whether invited as customers or not, have the same right of free speech as they would have in the streets of a city or town (*Lloyd Corp. v Tanner, supra,* pp 568-569).

In reaching its decision in *Lloyd* (*supra*), the court distinguished its earlier holdings in *Marsh v Alabama* (326 US 501) and *Food Employees v Logan Plaza* (391 US 308), in which limited rights of access to privately held property for purposes of the exercise of 1st Amendment rights were recognized. *Marsh* involved the right of the Jehovah's Witnesses to distribute religious literature on the streets of a privately owned company town. There the court found that although privately owned, the business district of the town was the equivalent of that of any other municipality and, since private interests were substituting for and performing the customary governmental functions, 1st Amendment freedoms could not be denied when exercised on the town's sidewalks and streets (*Marsh v Alabama, supra,* pp 502-503). The majority in *Lloyd* distinguished the facts before it from the situation in *Marsh* in which the private enterprise had assumed "all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State" (*Lloyd Corp. v Tanner,* 407 US 551, 569, *supra*). The nature and function of the shopping center in *Lloyd* was clearly not nearly so broad and far reaching.

In the other case distinguished by the *Lloyd* court (*supra*), *Food Employees v Logan Plaza* (*supra*), the court held that members of a labor union could picket outside a market located

within a privately owned shopping center. The holding, however, was limited, according to the *Lloyd* court, both by the fact that the purpose of the picketing was directly related to the use to which the shopping center property was being put, and further by the fact that because the target store was located in the center of a large private parcel there were no other reasonable opportunities for the pickets to convey their message. In *Lloyd,* on the other hand, the message sought to be conveyed — opposition to the draft and the war in Vietnam — had no direct relation to the business of the shopping center (*Lloyd Corp. v Tanner,* 407 US 551, 564, *supra*). Nor did the restriction of access to the shopping center deprive the leafleters of all reasonable opportunity to convey their message to the public since the center, which was located in downtown Portland, Oregon, was surrounded by public streets and sidewalks (*Lloyd Corp. v Tanner, supra,* pp 566-567).

A vigorous dissent was filed in *Lloyd* by Justice Marshall, joined by three other members of the court, in which it was argued that no reasonable distinction could be drawn between the case before them and the *Logan Plaza* case (*supra*) and that the issue simply was one of a balancing of interests between rights of property and rights of free expression in which the balance must be struck in favor of the latter (407 US 551, 571, 580, *supra*). Parenthetically, it is to be noted that *Logan Plaza,* which the court had distinguished and upon which the dissent so heavily relied, was subsequently overruled in *Hudgens v National Labor Relations Bd.* (424 US 507).

Accordingly, it is clear that for purposes of 1st Amendment analysis, the Smith Haven Mall, regardless of its size, location or mode of operation, retains its private character, and that the policy of its management prohibiting leafleting of the type at bar cannot in any respect be considered to be violative of plaintiffs' Federally protected constitutional rights of freedom of expression.

Thus, the controversy as it comes to us requires that we engage in an independent analysis of the provisions of our own State Constitution to determine whether the separate protections afforded plaintiffs thereunder have been violated by the actions of the management of the Smith Haven Mall. In that respect, plaintiffs predicate their claim on the provisions of the State Constitution, article I, §§ 8, 9, which, respectively, protect the rights of free speech and press and freedom of assembly and petition. Those provisions read in relevant part as follows:

Section 8: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." Section 9: "No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof". What is at issue before us is whether these provisions of our State Constitution afford the citizens of our State broader rights of free expression on the property of a large, privately held shopping center than are available under the Federal Constitution.

In many areas of personal liberties, the Federal constitutional guarantees, as they have been interpreted by the United States Supreme Court, have been found to satisfy and, in some cases, exceed the guarantees provided by the coinciding provisions of our State Constitution (*People v Adams,* 53 NY2d 241, 250). When, however, the Federal Constitution, as interpreted by the Supreme Court, has fallen short of what is deemed to be adequate protection of the rights of our citizens, our Court of Appeals has not hesitated to rely upon the principles of federalism under which the Federal Constitution is viewed as providing the minimum level of guarantees and protections, and the States are recognized as being free to provide greater rights for their citizens through interpretation of their constitutions, statutes and rule-making power (*People v Adams, supra,* p 250; *Cooper v Morin,* 49 NY2d 69, 79, *cert denied sub nom. Lombard v Cooper,* 446 US 984; *Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 159-161). Indeed, in recent years, the Supreme Court has encouraged States to place a greater emphasis upon the independent role of their own constitutions in prescribing the rights of their citizens in a manner which is more responsive to specific local needs and experiences (*see, Patterson v New York,* 432 US 197; *PruneYard Shopping Center v Robins,* 447 US 74; *Barker v Wingo,* 407 US 514; *see also,* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv L Rev 489; *Developments in the Law: The Interpretation of State Constitutional Rights,* 95 Harv L Rev 1324, 1496-1497).

With respect to the rights of our citizens under our State Constitution, article I, § 8, the Court of Appeals has recognized that "at the very least, the guarantee of freedom of expression set forth in our State Constitution is of no lesser vitality than that set forth in the Federal Constitution" (*Bellanca v New York State Liq. Auth.,* 54 NY2d 228, 235, *cert denied* 456 US 1006; NY Const, art I, § 8), and may even afford greater protection (*People v Ferber,* 57 NY2d 256).

As was recently pointed out by now Chief Judge Wachtler in his concurring opinion in *Matter of Beach v Shanley* (62 NY2d 241, 255):

"The fact that the Supreme Court has held the First Amendment applicable to the States does not eliminate the right or the need of this State to provide a distinct guarantee of freedom of the press under the State Constitution (*PruneYard Shopping Center v Robins,* 447 US 74, 81). It is often forgotten that diversity is the essence of federalism and that the Federal Constitution only guarantees minimum protections, leaving to the States the task of affording additional or greater rights under their Constitutions, tailored to the special needs and traditions of the various States (*People v Adams,* 53 NY2d 241, 250). There is probably no area in which State attitudes are more diverse, and thus where independent State constitutional rights serve their intended purposes, than in the area dealing with freedom of expression (e.g., *Miller v California,* 413 US 15).

"This State has long provided one of the most hospitable climates for the free exchange of ideas."

To date, however, there has been no occasion for the courts of our State to interpret our State Constitution with respect to the specific issue at hand, i.e., whether under our State Constitution the right of free expression may be exercised on privately owned property which has taken on the characteristics of a downtown business district or town center.

The most similar case to the one before us, but one which is clearly distinguishable on its facts, is *Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co.* (297 NY 339, *cert denied* 335 US 886). In *Watchtower,* the plaintiff, the governing body of the Jehovah's Witnesses, brought an action seeking to declare invalid a regulation of the management of a private residential development known as Parkchester. The regulation, in effect, barred solicitations and canvassing of any variety within the 171 apartment buildings making up the development, absent either the consent of the manager or the prior written consent of the tenant of a particular apartment (297 NY 339, 342-343, *supra*). In upholding the regulation in the face of both State and Federal constitutional challenges, the Court of Appeals distinguished the then recent Supreme Court decisions in *Marsh v Alabama* (326 US 501, *supra*), and *Tucker v Texas* (326 US 517). Those cases, the court reasoned, merely reaffirmed the right of individuals to distribute leaflets on streets, sidewalks and public places of municipalities which " '[have], from ancient times, been a part of the privileges, immunities, rights, and liberties of

citizens' " (*Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co.,* 297 NY 339, 348, *supra,* citing *Hague v Committee for Indus. Org.,* 307 US 496, 515). "[T]he narrow inner hallway of [the] upper floor of an apartment house" the court said, "is hardly an appropriate place at which to demand the free exercise of those ancient rights" (*Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co., supra,* p 348). What the court then said highlights that which distinguishes *Watchtower* from the case at bar (*supra,* p 348): "Our purpose in thus briefly analyzing those decisions is to show that they do not (nor do any others of which we know) go nearly so far as appellants would have us go here. Parkchester, like Chickasaw, Alabama [in *Marsh v Alabama*], and the Federal housing community in Texas [in *Tucker v Texas*], is privately owned, but there the similarity as to facts ends. It is undisputed that this defendant has never sought in any way to limit the Witnesses' activities on the streets or sidewalks of Parkchester, some of which are privately, and some publicly, owned. The distribution which this defendant's regulation inhibits was not on streets, sidewalks or other public or quasi-public places, but inside of, and into, the several floors and inner hallways of multiple dwellings. Moreover, defendant's regulation did not absolutely debar these ministers from their visits in the buildings and their persuasions therein, since it allowed them, whenever a tenant so desired, and expressed his desire. We think the *Bohnke* case [287 NY 154] is still the law and leaves valid the regulation of door-to-door calls along public streets. But, regardless of the *Bohnke* ruling, no case we know of extends the reach of the Bill of Rights so far as to proscribe the reasonable regulation, by an owner, of conduct inside his multiple dwelling." Obviously, there is a distinct difference between the claimed right of expression sought to be recognized in *Watchtower,* i.e., to engage in expressive activity within the hallways of a residential apartment building, and the claimed right in the instant case to engage in such activity in a large regional shopping center which invites the general public onto its premises for commercial and other purposes and which has, in our view, taken on the attributes of a downtown business district or town center.

While the precise question which now faces us has not before been addressed in New York, it has been considered by a number of other States. Perhaps the most prominent of these sister State cases is *PruneYard Shopping Center v Robins* (447 US 74, *supra*), in which a group of California high school students commenced an action seeking to enjoin a privately owned shopping center from barring them from its premises

where they sought to solicit signatures on a petition to the President of the United States in opposition to a United Nations resolution against Zionism. On appeal from a judgment of the trial court denying the injunction, the California Supreme Court reversed and held "that the soliciting at a shopping center of signatures for a petition to the government is an activity protected by the California Constitution" (*Robins v Pruneyard Shopping Center,* 23 Cal 3d 899, 902, 592 P2d 341, 342). In reaching its conclusion, the court found that the United States Supreme Court decision in *Lloyd Corp. v Tanner* (407 US 551, *supra*) did not identify any special Federally protected property rights in shopping center owners such as would bar the creation of broader free speech rights under the California Constitution than is recognized under the Federal Constitution. Having concluded that there was no such bar, the court also found "that sections 2 and 3 of article 1 of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned" (23 Cal 3d 899, 910, 592 P2d 341, 347, *supra*). The court stated that the words of the California Constitution's free speech provision were not identical to those of the Federal Constitution and pointed out that its past decisions had highlighted the special protections accorded speech under this " 'protective provision more definitive and inclusive than the First Amendment' " (23 Cal 3d 899, 908, 592 P2d 341, 346, *supra,* quoting from *Wilson v Superior Ct.,* 13 Cal 3d 652, 658, 532 P2d 116, 120).

In upholding the decision of California's highest court, the United States Supreme Court undertook a brief review of its past decisions in this area from *Marsh v Alabama* (326 US 501, *supra*) and *Food Employees v Logan Plaza* (391 US 308, *supra*), through *Lloyd Corp. v Tanner* (407 US 551, *supra*) and *Hudgens v National Labor Relations Bd.* (424 US 507, *supra*). The court pointed out that in *Lloyd* it had held that merely because a privately owned shopping center is open to the general public, the Federal Constitution did not create greater individual rights of expression thereon than already existed. The court noted, however, that *Lloyd* in no sense imposed any limitation upon the authority of a State "to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution" (*PruneYard Shopping Center v Robins,* 447 US 74, 81, *supra*). Unlike *PruneYard,* the court stated, in *Lloyd* there had been no constitutional or statutory provision creating rights of expression on private property by strangers.

The court then went on to address the shopping center's contention that the 5th and 14th Amendment guarantees against the taking of property without just compensation and against the deprivation of property without due process of law encompass the right to exclude others from that property. While acknowledging that the right to exclude others is an essential element of the rights of a property owner and that there had been a "taking" by virtue of the decision to allow strangers to exercise their rights of expression on the property, the court noted that not every interference with property rights by governmental action constitutes a taking in the constitutional sense (*Armstrong v United States*, 364 US 40). Whether a governmental action constitutes a "taking" requires an examination of the character of the action, the economic impact and the degree of its interference with reasonable investment-backed expectations. Applying these guidelines, the Supreme Court concluded that there was no unconstitutional taking because there was nothing to indicate that preventing the shopping center's owner from prohibiting this sort of activity would unreasonably impair the use or value of its property. It was pointed out that the California decision had made it clear that the shopping center had the ability to minimize any interference with its commercial functions by adopting time, place and manner regulations restricting expressive activity (*PruneYard Shopping Center v Robins*, 447 US 74, 83, *supra*). Further, the court found that the State's asserted interest in promoting more expansive free speech and petition rights under its Constitution satisfied the demands of due process (447 US 74, 85, *supra; see also, Nebbia v New York*, 291 US 502, 510-511).

Finally, the court rejected the claim by the shopping center that the State was infringing upon its 1st Amendment rights by compelling it to provide a forum for the speech of others. The court noted in this regard that by its own choice, the shopping center had declined to limit the property to its personal use, and that with the general public coming and going as they pleased, it was unlikely that they would identify the views expressed by those passing out leaflets or soliciting signatures with those of the owner of the shopping center (447 US 74, 85-88, *supra*). In addition, the court pointed out that since the decision of the California Supreme Court did not dictate that a specific view or message be conveyed, there was no danger of governmental discrimination for or against a particular view, and the property owner was free to take measures to expressly disavow any connection with the views being expressed.

Thus, following *PruneYard (supra)*, it is clear that there is no Federal constitutional bar to a State according its citizens the right to engage in expressive activity in a large, privately owned shopping center. Such activity breaches neither the property nor the 1st Amendment rights of the owner of the shopping center.

In addition to California, several other States, recognizing the special roles of speech and petition under their own Constitutions, have determined to allow limited intrusions upon private property for the purpose of safeguarding the effective exercise of those rights (*see, Alderwood Assoc. v Washington Environmental Council,* 96 Wn 2d 230, 635 P2d 108; *Batchelder v Allied Stores Intl.,* 388 Mass 83, 445 NE2d 590; *see also, Commonwealth v Tate,* 495 Pa 158, 432 A2d 1382; *State v Schmid,* 84 NJ 535, 423 A2d 615, *appeal dismissed sub nom. Princeton Univ. v Schmid,* 455 US 100; *cf. Cologne v Westfarms Assoc.,* 192 Conn 48, 469 A2d 1201; *State v Felmet,* 302 NC 173, 273 SE2d 708).

Similarly, our Court of Appeals has acknowledged the special role that free speech and exchange of ideas plays in the democratic process of our State and has consistently recognized that the free speech provisions of our Constitution may, in fact, provide even broader protections than are provided under the 1st Amendment (*see, Matter of Beach v Shanley,* 62 NY2d 241, *supra; People v Ferber,* 57 NY2d 256, *supra*). The language of our constitutional free speech provision, like that in the California Constitution, affirmatively proclaims the right of free speech (*compare,* NY Const, art I, § 8, *with* Cal Const, art 1, § 2) decreeing that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right" and then adds the caveat that "no law shall be passed to restrain or abridge the liberty of speech or of the press" (NY Const, art I, § 8). Contrast this with the 1st Amendment's explicit protection of free speech from Government intrusion: "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances" (US Const, 1st amend). While the difference between the language used in the two provisions to express the right to freedom of expression may not be conclusive of the question of whether under our State Constitution free speech may be protected from certain private action, it does provide a basis for applying a more flexible standard for determining what type of protection is to be afforded to free speech than the standard imposed by the United States Supreme Court under the Federal Constitution (*see, Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 160, *supra; see also, PruneYard Shopping Center v*

*Robins,* 447 US 74, *supra; Matter of Beach v Shanley,* 62 NY2d 241, *supra; People v Ferber,* 57 NY2d 256, *supra; Bellanca v New York State Liq. Auth.,* 54 NY2d 228, *cert denied* 456 US 1006, *supra;* Note, *Private Abridgment of Speech and the State Constitutions,* 90 Yale LJ 165, 177-82). This distinction also serves to bolster the position that the State and Federal free speech provisions are not simply mirror images of each other to be construed in all cases in pari materia. Finally, this position is strengthened even further by the fundamental principle of federalism referred to earlier under which the protections afforded to individual liberties by the Federal Constitution are to be looked upon as the minimums available to all citizens and that the States are to independently analyze their individual constitutions to determine, with an eye toward local problems and experiences, the exact scope of the protections afforded thereunder (*People v Adams,* 53 NY2d 241, 250, *supra; Cooper v Morin,* 49 NY2d 69, 79, *supra; Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, *supra*).

Turning to the case before us, we see no sound basis for denying the citizens of New York the right of free expression enjoyed by them under our State Constitution, article I, §§ 8, 9 when they have entered a shopping center like the Smith Haven Mall which, because of its location and mode of operation, has become clothed with all of the attributes of the traditional downtown business area or town center (*Marsh v Alabama,* 326 US 501, *supra*). While the Supreme Court has now clearly rejected any Federal constitutional rights to freedom of expression in shopping malls such as the one at bar (*Lloyd Corp. v Tanner,* 407 US 551, *supra; Hudgens v National Labor Relations Bd.,* 424 US 507, *supra*), the principles regarding expressive activity in quasi-public forums first set forth in *Marsh v Alabama* (326 US 501, *supra*), and later expanded in *Food Employees v Logan Plaza* (391 US 308, *supra*), remain good law and provide a sound basis for determining the scope of State constitutional protections in this area. The continued vitality of these two cases is evidenced by the recent approving reference to them in *People v Leonard* (62 NY2d 404, 410) to support the proposition that "when the public enjoys broad license to utilize certain property, State trespass laws may not be enforced solely to exclude persons from exercising First Amendment or other protected conduct in a manner consistent with the use of the property". Although *Leonard* concerned the right of access to clearly public property — a State University campus — it bears noting that both *Marsh* and *Logan Plaza* concerned access to private property, a fact which certainly did not escape the

attention of the court. Those cases were also favorably cited in the dissenting opinion in *People v Bush* (39 NY2d 529), written by former Chief Judge Cooke, in which he was joined by then Chief Judge Breitel. The majority in *Bush* had found no basis for ruling upon the State constitutional questions presented as to the rights of union members to picket outside a supermarket, since not only was there no basis for finding the property to be analogous to a company town or public area, but the pickets had refused to comply with a reasonable regulation as to the mode of their picketing. The dissenters, however, concluded that there was such considerable confusion in the area of free speech rights that one could not intelligently determine whether his or her conduct amounted to criminal trespass. They reasoned that it was necessary to analyze the case under the free speech provision of the State Constitution and stated (39 NY2d 529, 542, *supra*): "Under this analysis, it is concluded that the rationale of *Logan Val.* supplies a commendable balance between freedom of expression and intrusions on privately owned property used as a shopping center. As observed in *Marsh v Alabama* (326 US 501, 506): 'Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' The present day shopping center possesses few characteristics traditionally identified as part of the private domain. In this view, the words of Mr. Justice MARSHALL are apt: 'In *Logan Valley* we recognize what the Court today refuses to recognize — that the owner of the modern shopping center complex, by dedicating his property to public use as a business district, to some extent displaces the "State" from control of historical First Amendment forums, and may acquire a virtual monopoly of places suitable for effective communication. The roadways, parking lots and walkways of the modern shopping center may be as essential for effective speech as the streets and sidewalks in the municipal or company-owned town' (*Hudgens v N.L.R.B.*, 424 US 507, 539-540, *supra* [dissenting opn])." The dissenters concluded that as a matter of State constitutional law, "where a privately owned shopping center has been so 'thoroughly clothed in the attributes of public property that it may not be completely closed as a public forum to those who wish to present otherwise lawful communications' (*American Radio Assn. v Mobile S.S. Assn.*, 419 US 215, 230), a labor union may peacefully picket there to disseminate its views, without fear of criminal liability under a trespass statute" (*People v Bush*, 39 NY2d 529, 542, *supra*).

As the *Logan Plaza* court (*supra*) recognized, in many areas suburban malls have come to replace downtown business districts as the traditional public gathering place or forum. The facts in the case at bar bear out that conclusion. It is clear from the record that the Smith Haven Mall is the major retail center of Suffolk County and provides one of the most — if not the most — effective forums for reaching the populace with expressive activity. The trend away from downtown shopping areas as the gathering place for the citizenry should not become a vehicle for eroding the ability of those seeking to exercise their expressional freedoms to find an effective forum for the communication of their ideas. In an area where the principal forums are privately held, some accommodation must be made to ensure that the rights of free expression are not intruded upon. We find that in this case, by permitting limited nonobstructive access to the Smith Haven Mall for purposes of leafleting with regard to matters of public concern, a proper balance is struck between plaintiffs' rights of freedom of expression and the private property interests of the mall.

We would note, however, that our holding should not be construed as a blanket sanction to engage in expressive activity on any privately held property or to engage in unrestricted activity thereon. Rather, there are sound limitations upon the situations in which private property may be intruded upon. The Supreme Court of New Jersey, for example, in its opinion in *State v Schmid* (84 NJ 535, 423 A2d 615, *supra*), wherein it upheld the right of individuals to distribute political leaflets on the campus of a private educational institution, devised a three-part test to be applied in cases such as the one at bar to achieve a balance between the protections to be accorded private property and the protections to be accorded expressive activity upon such property. The New Jersey court stated that a court must look first to the normal use of the private property, then consider the nature and extent of the invitation to the public to use that property and, finally, examine the purpose of the expressive activity (84 NJ 535, 563, 423 A2d 615, 630, *supra*). We find this approach useful, and would recommend its application as a basis for resolving controversies of this nature which may arise in the future.

Obviously, the Smith Haven Mall is first and foremost designed to serve as a center for commercial activity. But it is clear as well that the mall was designed to serve as a gathering place and events center. Its intended use from its inception was to serve multiple purposes. The manner in which the mall has functioned makes it clear that its invitation to the public is a

broad one. Individuals are not merely invited to shop; they are encouraged to linger and partake of the various programs and events scheduled at the mall — programs and events covering a broad spectrum from entertainment to community and charitable events to educational programs. The Smith Haven Mall is perhaps the clearest example of the type of shopping center which has assumed all of the characteristics of the downtown business district or town center. It is a property which must, in our view, make an accommodation to the exercise of free speech by the general public — in this case expression with respect to the sharply debated but vitally important issues of nuclear power and nuclear weaponry. Full expression of ideas in these areas is not only desirable but is to be encouraged.

Based upon the foregoing analysis, we conclude that, under the facts at bar, our State Constitution, article I, §§ 8, 9 protect the right of the plaintiffs to engage in leafleting at the Smith Haven Mall subject to reasonable regulation as to the time, place and manner of such activity.

Accordingly, the judgment appealed from should be affirmed.

NIEHOFF, J. (dissenting). In this case plaintiffs who have a respected and important cause to espouse seek to compel defendant, the owner of a shopping mall, to furnish them, rent free, with space in the mall where they may distribute leaflets advocating their beliefs. They assert that the provision of the Bill of Rights contained in the New York State Constitution guaranteeing the exercise of free speech gives them the right to make such demand of defendant and requires defendant to accede to it.

The United States Supreme Court, in a case which is indistinguishable from the case at bar, when called upon to pass on the issue of whether such right exists under the free speech clause of the Federal Constitution, concluded that such provision, which was designed to protect the individual against action by governmental authorities, and not by private persons, does not bestow a right on persons desiring to distribute leaflets (espousing a cause in which they believe) to do so on the property of a large, privately owned suburban shopping mall and does not compel the owner of such a shopping center to allow such leafleting on its property (*see, Lloyd Corp. v Tanner,* 407 US 551; *Hudgens v National Labor Relations Bd.,* 424 US 507).

Recognizing that such ruling by the United States Supreme Court prevents them from relying upon the Federal Constitution, plaintiffs have turned to the New York Constitution in the

hope of persuading the courts of this State to reject the well-reasoned holdings of the United States Supreme Court outlined in the foregoing cases and to interpret the State Constitution as granting them a right which all agree they do not possess under the Federal Constitution.

Special Term labeled this case as one of "novel impression" involving "the right of free speech versus the right of privacy" (*SHAD Alliance v Smith Haven Mall*, 118 Misc 2d 841). Faced with choosing between the almost holy right of free speech and the property or privacy rights of a large commercial enterprise, the temptation is well-nigh irresistible to be moved to declare that the exalted right of free speech must, of necessity, take precedence over the rights of property and/or privacy, particularly since the intrusion by plaintiffs on such rights in most cases is likely to be minimal in nature. Indeed, looking at this case as though it involves little more than a balancing of the aforementioned rights, the contest between the litigants before us becomes a lopsided one, or no contest at all. Hence, it is not at all surprising that Special Term, having stated at the outset of its opinion that this case involves "the right of free speech versus the right of privacy", would be prompted to be more expansive in its ruling on plaintiffs' claim than the United States Supreme Court would have been had the case been predicated on the Federal Constitution.

But, the issue we are called upon to decide involves more than a simple balancing of conflicting rights. Before any such balancing may be undertaken it must be determined whether plaintiffs have *any* right under the New York State Constitution to insist on being permitted to distribute their leaflets on defendant's privately owned property.

Until Special Term decided this case no court in this State had ever ruled in a reported decision that an individual's constitutional right of free speech could be exercised on the private property of another individual against the owner's wishes. Indeed, all of the reported cases hold to the contrary. Special Term's ruling in the instant case, which impresses us as a "good result oriented" decision, flies in the face of well-established principles of law announced by our Court of Appeals as well as by the highest court in the land and, in our view, constitutes a usurpation of power by a court of this State. Therefore, we cannot vote to affirm that decision.

In short, we conclude, as did the United States Supreme Court when interpreting the Federal Constitution, (1) that when the framers of New York's Constitution prepared the Bill of Rights,

and when the people adopted it, they did not intend to confer a right on individuals to exercise their right of free speech on the private property of others without their consent, (2) that this court cannot arrive at the conclusion that the State Constitution confers such a right upon leafleteers or imposes a duty upon the private property owner to allow individuals to thus use its property without ignoring the history of the Bill of Rights and its purpose, and without undertaking to rewrite the Constitution, and (3) if there is to be any infringement upon the private property rights of one citizen by another on public policy grounds that encroachment must come about as the result of an act of the Legislature rather than by the courts extending the guarantees of the Constitution, on a case-by-case basis, to situations never envisioned by the framers of the Constitution and not reasonably encompassed by either the letter or spirit of that document.

There is no dispute concerning the operative facts.

Plaintiffs SHAD Alliance (SHAD) and Paumanok People's Organization (PPO) are organizations which oppose the use of nuclear energy to generate electricity. Plaintiffs Hank Glaser and Carol Cina are individuals who, in the past, have handed out leaflets opposing nuclear power. The defendant Smith Haven Mall (Mall) is a shopping center located in Suffolk County, Long Island, New York, owned by the Prudential Insurance Company of America and operated by a privately owned management company.

On two occasions, namely, July 5, 1980 and August 16, 1980, representatives of SHAD and PPO went to the Mall, stood under the portico at the main entrance to the Mall and began handing out leaflets opposing the use of nuclear power. On both of the above dates, the plaintiffs were stopped from leafleting by a representative of the defendant pursuant to a Mall policy which prohibits leafleting without the permission of the Mall manager. Thereafter, the plaintiffs sought permission to distribute their leaflets but were refused. This action ensued.

In their amended complaint, the plaintiffs seek injunctive and declaratory relief directing the defendant to permit them to distribute leaflets at the Mall. The relief is predicated upon NY Constitution, article I, §§ 8, 9 and 11 (any claim under this latter section has been abandoned). After issue was joined defendant moved for summary judgment dismissing plaintiffs' complaint in its entirety on the ground that the above-enumerated sections of the New York Constitution do not confer upon plaintiffs any

constitutional rights to distribute leaflets on the Mall's private property. The plaintiffs cross-moved for summary judgment permitting them to engage in leafleting at the Mall.

In its decision, Special Term asked the question: "In view of the Supreme Court decisions in *Hudgens* [*Hudgens v National Labor Relations Bd.,* 424 US 507] and *Lloyd* [*Lloyd Corp. v Tanner,* 407 US 551], that a privately owned and operated shopping center open to the public does not lose its private character and the First Amendment does not permit the distribution of handbills, can the New York Constitution afford a greater right of freedom of expression?" (*SHAD Alliance v Smith Haven Mall,* 118 Misc 2d 841, 845, *supra.*)

Special Term answered that question in the affirmative. It alluded to decisions of a number of sister States, some of which have interpreted their respective State Constitutions so as to permit certain expressive activity at privately owned shopping centers and some of which have held otherwise, and distinguished prior New York Court of Appeals cases involving the purported right of individuals to engage in expressive activity on private property where our Court of Appeals had ruled against the existence of the right. Special Term then adopted the precise reasoning that was rejected by the United States Supreme Court when it refused to compel private property owners to permit the distribution of leaflets under the 1st Amendment, and granted plaintiffs' cross motion for summary judgment.

As we have already indicated, we are unable to agree with Special Term's conclusion.

Analysis of the issues before us must begin with a recitation of certain facts and principles which we consider to be irrefutable.

1. The Mall is privately owned, private property, operated for the commercial benefit of Prudential Insurance Company and its tenants and, under well-established principles of law, the property cannot be said to have been dedicated to public use.

2. The defendant is not engaged in performing any functions or services of a governmental nature.

3. The individual plaintiffs are private citizens who are seeking a court-ordered, rent-free outlet on the defendant's private property for the dissemination of their ideas.

4. No "State action" of any kind is present in this case.

5. Historically, our State's courts, and particularly the Court of Appeals, have not hesitated to differentiate between the protection afforded by the United States Constitution and the Constitution of the State of New York where State action is

involved. Indeed, it can be said without fear of contradiction that when State action is present our Court of Appeals has been in the forefront when it has been called upon to draw distinctions between our State Constitution and the Federal Constitution (*see, e.g., People v Isaacson,* 44 NY2d 511; *Sharrock v Dell Buick-Cadillac,* 45 NY2d 152; *Cooper v Morin,* 49 NY2d 69, *cert denied sub nom. Lombard v Cooper,* 446 US 984; *People v Elwell,* 50 NY2d 231; *People v Adams,* 53 NY2d 241; *People v Ferber,* 57 NY2d 256; *Bellanca v New York State Liq. Auth.,* 54 NY2d 228, *cert denied* 456 US 1006).

6. However, where no State action has been involved our Court of Appeals has refused to hold that the Bills of Rights provisions of the Federal or State Constitution are applicable. The reason is abundantly clear. The constitutional protections contained in the Bills of Rights were adopted to serve as restrictions upon the power of the Federal or State Governments — they erect no shield against merely private conduct, however discriminatory or wrong (*see, e.g., Matter of Wilson,* 59 NY2d 461, 476-477).

7. On two occasions where our Court of Appeals has been called upon to determine whether the constitutional guarantee of freedom of speech imposes upon a private property owner the duty of making its property available to others to enable them to exercise that guarantee, the court has refused to so hold. Thus, in *Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co.* (297 NY 339, 342, *cert denied* 335 US 886), the ministers of Jehovah's Witnesses sought to distribute their literature door-to-door in "a residential community called Parkchester, which is said to be the largest of its kind in the world". The Court of Appeals held that a regulation prohibiting the entry into any apartment building for the purpose of canvassing, peddling, soliciting contributions or distributing literature except upon written consent or invitation of a tenant did not violate the free speech provisions of the Federal or State Constitutions. In reaching that conclusion the court said, in part (297 NY 339, 348, *supra*): "The distribution which this defendant's regulation inhibits was not on streets, sidewalks or other public or quasi-public places". This language points up the fact that our Court of Appeals views the Bill of Rights in our State Constitution as the United States Supreme Court views the Bill of Rights in the Federal Constitution, namely, as being directed at governmental action, or its equivalent, in some form. The opinion did not proceed on any balancing of rights analysis in which the "right" of free speech was in that case deemed to be subordinate to the right of a private property owner to control the use of its

property. Its premise appears to be the same as that adopted by the United States Supreme Court, namely, that individuals have no enforceable right of free speech on someone else's privately owned property. And, in *People v Bush* (39 NY2d 529), the Court of Appeals held that defendants, who were union members, were not protected by a constitutional guarantee of freedom of expression when they picketed on private property in front of a store which sold the products of their employer.

The foregoing decisions have prompted the authors of New York Jurisprudence to write (20 NY Jur 2d, Constitutional Law, § 274): "It is a firmly established principle of constitutional law that the state and federal constitutional guaranties of freedom of speech protect the individual against action by governmental authorities, not by private persons."

8. The "most basic of all the rules of constitutional construction (since it is the rule that all other rules may be said to be designed to implement) is the principle that a constitution is to be given the effect and meaning contemplated by its framers and by the people who adopted it, to be gathered if possible from the plain and ordinary meaning of the words used" (20 NY Jur 2d, Constitutional Law, § 22, and cases cited therein).

9. Just as the decisions of the United States Supreme Court construing the Federal Constitution as it pertains to the guarantee of freedom of speech do not bind the State courts in their interpretation of parallel provisions in the State Constitution, so, too, the decisions of sister State courts interpreting the Constitutions of their respective States do not bind the New York courts in their interpretation of the free speech provisions of the New York State Constitution.

10. Freedom of speech plays a vitally important role in our system of law and Government. This freedom is necessary to the enjoyment of the benefits of a free society and indispensible to political freedom. However, inviolable as is the right of free speech, it is not an absolute right which may be indiscriminately exercised under all the circumstances and conditions or which may be exercised everywhere.

11. If it is held that the free speech clause of the New York Constitution compels the defendant to make its property available to the plaintiffs for their purposes, it must follow that the defendant will be compelled to make its private property available rent free to every individual, group, or organization, irrespective of the nature of the ideas being advocated and without regard to whether the Mall owners agree or disagree with the ideas espoused by the individual or group. The Constitution does

not discriminate between those whose ideas are popular and those whose views arouse opposition or dislike or hatred, nor does it guarantee the right of freedom of speech to the former and withhold it from the latter. Hence, if the Constitution is held to require defendant to allow plaintiffs to distribute their literature on defendant's property, this private property owner may be forced to subsidize causes which are highly controversial, morally or socially offensive, explosive, or repugnant to the owner, by having to provide their proponents with a rent-free forum. The obvious result is that a number of the property owner's rights are trammeled upon or disregarded.

Special Term, without discussing the history of our State's Bill of Rights, declared that the intrusion on the right to privacy of the Mall and its tenants by allowing plaintiffs to distribute their leaflets is minimal. Of course, if the Constitution does not confer the right to exercise free speech on private property, it is irrelevant that the intrusion on the property owner's rights is minimal. What is more, although in the case of plaintiffs, the intrusion may be minimal, if this court construes the free speech provisions of the New York State Constitution as bestowing the right upon those espousing causes to do so on defendant's property, the intrusion by other groups may not be so minimal. In the State of Connecticut chaos erupted at the West Farm Mall when the Ku Klux Klan demonstrated there in the wake of a lower court decision to the effect that the mall could not bar such groups from exercising their right of free speech on its premises. People were injured, property was destroyed and the disturbance was not quelled until the West Hartford and New Britain SWAT teams arrived and sealed off most of the mall's entrances.

In that case the Supreme Court of Connecticut reversed the lower court holding and ruled that the courts of that State could not direct that the right of free speech in the State Constitution may be exercised upon private property consisting of a large regional shopping center, contrary to the wishes of its owners (*Cologne v Westfarms Assoc.*, 192 Conn 48, 469 A2d 1201). However, that decision came too late for those persons who sustained physical injuries and those persons who suffered considerable financial loss because the Klan had been permitted to exercise its claimed right of free speech on the mall property.

12. The time, place and manner restrictions permitted by Special Term impose a burden on the shopping center owner and cannot be enforced by it without cost to the shopping center, e.g., maintenance and clean up of the Mall and/or litigation expenses which will be incurred by the shopping center's owner if it is

called upon to defend the reasonableness of the restrictions it adopts. The shopping center will also have to provide additional security to its patrons to prevent confrontations which are inevitable whenever advocates of a cause seek to persuade others of the merits of that cause or when opponents of that cause make their appearance at the shopping center. Moreover, the center will have to assume the risks of property destruction and liability to persons for physical injuries if "things get out of hand".

With the preceding principles in mind we now proceed to examine the constitutional provisions on which plaintiffs base their claim that they have the right to distribute leaflets on defendant's private property.

The State Constitution, article I, § 8, reads as follows:

"8. [Freedom of speech and press; criminal prosecutions for libel]

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; *and no law shall be passed to restrain or abridge the liberty of speech or of the press.* In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the facts" (emphasis supplied).

Section 9 of article I provides, in relevant part: "No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof".

As we have already noted, the most fundamental of all rules of constitutional construction is the principle that a constitution is to be given the effect and meaning contemplated by its framers and by the people who adopted it, to be gathered if possible from the plain and ordinary meaning of the words used.

An examination of the language of the freedom of speech constitutional provision quoted above readily discloses that while the framers thereof proclaimed that every citizen was to have the right to "freely speak, write and publish his sentiments on all subjects" they also made it clear in the very same sentence that the only infringement on that right that the Constitution was designed to prohibit was by the government.

New York State Constitution, article I, the Bill of Rights, was added in 1821. As part of this Bill of Rights the State's first free

speech provision appeared. That provision was based directly upon the Federal Constitution, 1st Amendment. Like its Federal counterpart, the New York Bill of Rights was not intended to apply to private conduct, but was intended by its drafters to serve as a limitation on government action. It was noted during the Constitutional Convention of 1821 that the Bill of Rights "is not a bill enumerating the rights of the people, but restricting the power of the legislature" (Carter & Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 172) and that the Bill of Rights was "calculated to restrain useless and improvident legislation" (Carter & Stone, *op. cit.,* at 163). It was further noted during the convention that the Bill's purpose is "to keep before the eyes of the legislature a brief and paramount declaration of rights beyond which they cannot go" (Carter & Stone, *op. cit.,* at 163).

The New York State Bill of Rights found in NY Constitution, article I, is, in essence, the same as that contained in the first 10 amendments to the Federal Constitution and the purpose of the New York State Bill of Rights is the same as that of the Federal Bill of Rights, namely, to secure and/or preserve certain individual rights against interference by government exercising its awesome powers. Although the language in the New York Constitution differs slightly from that of the United States Constitution, it cannot fairly be denied that the framers of the language of both Bills of Rights chose substantially similar language designed to make it plain that such Bills were intended to protect the people from interference by their governments. Down through the years on numerous occasions the courts have expressed their recognition of the objective sought to be accomplished by the framers.

"The duty of the courts being to construe, not adopt, a constitution, a constitutional restriction is, within its defined limits, to be rigidly enforced according to its letter and its spirit. The courts must enforce the constitution as written, not as they think it might have been written, and must bear in mind that words in a constitution must be taken to have been used with some definite intent and purpose" (20 NY Jur 2d, Constitutional Law, § 25).

Therefore, in interpreting the New York State Constitution as it applies to the facts of this case we are not authorized or empowered to impose our personal concepts of what is "right" or "fair", or what public policy should be, or to consider whether the provision differently conceived and framed would yield results more consonant with fairness and reason. We take the

provision as we find it. It is our obligation to take the words of the clause to mean what they must directly and aptly express, in their usual and popular significance. It must be assumed that the authors of the Constitution had a thorough knowledge of the force and extent of the words they employed. It is the approval of the people of the State that gives force to a provision of the Constitution drafted by the convention, and in construing the Constitution the courts must seek the meaning the words convey to an intelligent, careful voter (*see,* 20 NY Jur 2d, Constitutional Law, § 28).

We consider it rather farfetched to suggest that the words chosen in drafting NY Constitution, article I, § 8, which are clearly aimed at curbing the immense power of the State, would convey to an intelligent, careful voter the notion that the owner of a private, large shopping center which is not exercising governmental powers but is seeking only to advance its commercial interests and those of its tenants, is also governed by the restrictive language "no law shall be passed to restrain or abridge the liberty of speech".

While it is true that constitutional law is "a progressive science" (*see, People v Nebbia,* 262 NY 259, 270, *affd* 291 US 502), and that the Constitution must, of necessity, be viewed as a flexible document to be made applicable to new situations, it does not follow that courts have the right to ignore history, or the letter and spirit of the Constitution to arrive at results which appeal to their individual notions of what form public policy should take. The courts of this State have demonstrated on countless occasions that they are sensitive to, and solicitous of, the rights of its citizens, whether conferred by Constitution or otherwise, and they are under no obligation to ignore the persuasive force of well-reasoned opinions of the United States Supreme Court, which are on all fours, in order to prove that the courts of this State are more progressive than the United States Supreme Court on the subject of freedom of speech. Even though the Supreme Court decisions, mentioned earlier, which are directly on point are not binding on us, we see no escape from the impressive nature of their reasoning or any reason to "go our own way".

Not surprisingly, extensive research has uncovered no New York cases which have extended any provision of this State's Bill of Rights to private action between two (or more) private citizens. The lack of any such authority stems from the obvious fact, already noted, that the Bill of Rights simply does not apply

to such a situation. New York's constitutional free speech provision has no part to play where a citizen's speech is curtailed by the acts of another private citizen. This is so whether the curtailing citizen is the owner of a vacant lot, a single-family home, a multiple dwelling, a business office, a small store or small shopping center, or, as in the case at bar, a large shopping center. It is not the size of the party or property which limits or prohibits the exercise of speech but its character, i.e., governmental or nongovernmental, which is determinative of whether or not the limited party is clothed with protection under our Bill of Rights. Once it is established that the prohibition is governmental in nature, i.e., that State action in some form is present, our citizens are clothed with the fullest protections afforded by New York's Bill of Rights. On the other hand, if no State action is involved, there is nothing for the Bill of Rights to protect against, and its provisions have no role to play in the resolution of a private dispute.

In the instant case, all agree that the defendant owns a large shopping mall in Suffolk County and that in order to promote the commercial interests of the Mall owner and its tenants the owner encourages certain activities of a noncommercial nature on the Mall premises. However, it is undisputed that the property is privately owned and the owner is taxed as a private property owner. The owner of the property has not dedicated any part of it to the public and the owner has not assumed the attributes "of a state-created municipality and the exercise * * * of semi-official municipal functions as a delegate of the State" (see, Lloyd Corp. v Tanner, 407 US 551, 569, supra; Marsh v Alabama, 326 US 501). No doubt, the center attracts a great number of people and, if permitted, plaintiffs could distribute their leaflets to a considerable number of people within a short space of time. But, that is irrelevant because there is no escape from the fact that the shopping center preforms no governmental services and there is nothing in the character of the shopping center which makes it governmental, or the functional equivalent of a government, in nature, so as to bring the plaintiffs within the ambit of the free speech provisions of the Bill of Rights when they enter upon defendant's private property.

The view that we take is not a startling or reactionary one. It is a view which we believe demonstrates a respect for history and sound precedent. It is a view espoused not only by the United States Supreme Court but by other State courts. For example, in Cologne v Westfarms Assoc. (192 Conn 48, 50, 469 A2d 1201, 1202, supra), the Connecticut Supreme Court, like this court, was called upon to decide "whether a court of this

state may direct that the rights of free speech and petition in our state constitution may be exercised upon private property consisting of a large regional shopping center, contrary to the wishes of its owners".

After discussing the decisions handed down on the subject in various States, a majority of the members of the Connecticut court found that the issue was an open one whose outcome was dependent upon the intent of the framers of the Constitution and concluded that Connecticut's free speech provisions were " 'designed as a safeguard against acts of the state and do not limit the private conduct of individuals or persons' " (192 Conn 48, 63, 469 A2d 1201, 1209, *supra,* quoting *Lockwood v Killian,* 172 Conn 496, 501, 375 A2d 998, 1001). That, as we have shown, is also true of New York's free speech provision. In ruling that Connecticut's free speech provisions did not require that the owner of a large regional shopping center permit persons to exercise their right of free speech on its private property the Connecticut court stated (192 Conn 48, 62, 469 A2d 1201, 1208, *supra*):

"There is nothing in the history of these documents to suggest that they were intended to guard against private interference with such rights. Similarly, a review of their origin discloses no evidence of any intention to vest in those seeking to exercise such rights as free speech and petition the privilege of doing so upon property of others.

"This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy uninhibited by the history which attended the adoption of the particular phraseology at issue and the intentions of its authors. The faith which democratic societies repose in the written document as a shield against the arbitrary exercise of governmental power would be illusory if those vested with the responsibility for construing and applying disputed provisions were free to stray from the purposes of the originators. 'If the words have a doubtful meaning, or are susceptible of two meanings, they should receive that which will effectuate the intent of the framers of the Constitution and the general intent of the instrument.' *Borino v. Lounsbury,* 86 Conn. 622, 625, 86 A. 597 (1913)."

In arriving at its conclusion herein, Special Term did not discuss the objective sought to be accomplished by the New York State Bill of Rights. Rather, Special Term seems to have taken the United States Supreme Court's statement of its recognition

of the fact States are permitted to confer greater freedom of expression on their citizens than does the United States Constitution as an irresistable invitation to do so. Because the courts of several States, which do not require the presence of State action for their constitutions to afford greater freedom of expression rights than the 1st Amendment, have departed from the rulings adopted by the Supreme Court in construing the 1st Amendment, Special Term concluded that New York State should follow a similar course in this matter.

In so doing, Special Term merely adopted the argument advanced by plaintiffs which boils down to the following: "Plaintiffs do not contend that the State Constitution must be applied to private property as a general principle. Rather, plaintiffs contend that this shopping center cannot reasonably be viewed as a private space despite its private ownership. Having been operated and designed as the functional equivalent of a town center, the shopping center cannot escape the town's obligation to accommodate free speech under the State Constitution."

It will be noted that plaintiffs recognize that it is "the *town's* obligation to accommodate free speech under the State Constitution" (emphasis added). But, they seek to impose the town's obligation on the private property owner by arguing that the private property owner operates his property "as the functional equivalent of a town center". In short, starting with the premise that the Smith Haven Mall has become the equivalent of a town center, plaintiffs argue that this requires that the Mall be treated as though it is public property for State constitutional free speech purposes. We do not believe that we can, in common sense and good reason, extend constitutionally protected free speech to privately owned shopping centers merely because the public is invited, and encouraged, to enter upon the property of such centers for the purpose of doing business. One cannot, by the mere act of waving the magic wand of "functional equivalent" over the Smith Haven Mall, convert it from private property which is used for commercial purposes into public property which falls under the interdiction of the Constitution of the State. We turn to the words of the United States Supreme Court written in response to the very argument presented by plaintiffs herein (*Lloyd Corp. v Tanner,* 407 US 551, 568-570, *supra*).

"Respondents contend, however, that the property of a large shopping center is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which

are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

"The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* v. *Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power.

"Nor does property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center. This is not to say that no differences may exist with respect to government regulations of rights of citizens arising by virtue of the size and diversity of activities carried on within a privately owned facility serving the public. There will be, for example, problems with respect to public health and safety which vary in degree and in the appropriate government response, depending upon the size and character of a shopping center, an office building, a sports arena, or other large facility serving the public for commercial purposes. We do say that the Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. But on the facts presented in this case, the answer is clear.

"We hold that there has been no such dedication of *Lloyd's* privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights."

Where is the flaw in the foregoing reasoning? And where can this court find a sound legal basis for holding, in the circumstances of this case, where it is clear that the private enterprise has not assumed the attributes of a State-created municipality and the enterprise is not exercising semiofficial municipal functions as a delegate of the State, that the drafters of the New York Bill of Rights meant to bestow a broader right of free speech on its citizens than did the drafters of the Federal Bill of Rights?

To sum up, unless a citizen's exercise of free speech is impaired by a governmental act or its equivalent, the Bill of Rights simply does not come into play and that fact is not altered by the nature (person, partnership, corporation) or size of the offending private citizen. Inasmuch as the Bill of Rights was not intended to be applicable to private conduct, it is of no moment whether or not the Mall can be characterized as the functional equivalent of a town center.

Although we are not required either to follow or to repudiate the decisions of the courts of sister States when we interpret our own Constitution, or even to discuss them, we believe it advisable to comment on the California holding in *Robins v Pruneyard Shopping Center* (23 Cal 3d 899, 592 P2d 341), inasmuch as the members of our court constituting the majority herein consider it significant.

In the *Robins* case (*supra*), suit was brought against the owners of a private shopping center for an injunction to prevent denial of use of the premises for soliciting signatures for a petition to the Government. By a vote of 4 to 3, the Supreme Court of California ordered that the shopping center owner "be enjoined from denying access to circulate the petition" (23 Cal 3d 899, 911, 592 P2d 341, 348, *supra*). The holding is summed up in these words (23 Cal 3d 899, 902, 592 P2d 341, 342, *supra*): "we hold that the soliciting at a shopping center of signatures for a petition to the government is an activity protected by the California Constitution".

It is noteworthy that in reaching that conclusion the California Supreme Court gave absolutely no recognition to the fundamental principle, discussed above, which both the United States Supreme Court and the courts of this State have announced and followed down through the years, namely, that the guarantees of freedom of speech contained in the Federal and New York State Bills of Rights protect the individual against action by governmental authorities, and not by private persons, and that unless there is State action present, or the private person performs, in

effect, "the full spectrum of municipal powers [so as to stand] in the shoes of the State", the constitutional guarantee of free speech does not come into play (*Lloyd Corp. v Tanner,* 407 US 551, 569, *supra*). The California court did not state or hold that the shopping center owner was exercising any powers usually exercised by government. Nor did it find that State action or its equivalent was present. Rather, the California court chose not to require a showing of State action in order to trigger the applicability of its Constitution. It spoke of the right of society to impose restraints on private property owners and of the importance of free speech in the State of California and concluded its opinion with these words (23 Cal 3d 899, 911, 592 P2d 341, 347-348, *supra*): "A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations * * * would not markedly dilute defendant's property rights".

Thus, the California court appears to have founded its decision on the premise that under the California Constitution no showing of State action was necessary and that what was involved in the *Robins* case (*supra*) was simply a balancing of rights, i.e., that of free speech versus that of private property or privacy. As we have already said, Special Term in this case appears to have taken a similar course in arriving at its decision. In that balancing equation, the California court and Special Term deemed the free speech right to be paramount, but subject to regulation. There is an underlying difficulty with, or weakness in, our adopting and applying that approach to this case. As we have previously noted, a balancing of conflicting rights is not to be embarked upon until it is established that there are conflicting rights. The fundamental issue to be decided in this case is whether the freedom of speech right found in the New York State Constitution applies on private shopping center property. Until it is demonstrated that plaintiffs have such a right there is nothing to balance. So if, as we say, the New York State Constitution does not bestow such a right, no balancing of rights is involved. Simply stated, the leafleteer has no enforceable right of free speech on private property. By contrast the private property owner does have property and privacy rights which he can enforce against the leafleteer.

As noted earlier, in the *Watchtower* case (297 NY 339, *cert denied* 335 US 886, *supra*), our Court of Appeals did not adopt a balancing of interests analysis. It proceeded on the basis that the private property owner was not under any constitutional

compulsion to allow leafleteers to use its property as a forum for the dissemination of their ideas.

In short, we read the California case as being based on a premise we cannot accept, namely, that notwithstanding the absence of State action in some form, individuals have a constitutional right of free speech on private property merely because the owner has invited large numbers of the general public to come onto the property. That kind of reasoning has no support in the language of the New York Constitution and the cases which have interpreted the provisions of our Bill of Rights. Such reasoning, carried to its logical extreme, would mean that the public can demand the right to engage in expressive activities on the property of every establishment which is open to the public and which attracts a considerable number of patrons. That may well be a noble policy for our State to have, but if such a policy is to be adopted, the initiative must come from the Legislature. It is not for the courts to proclaim the existence of such policy by extending the Constitution beyond its proper bounds.

What is more, although the California court made reference to the free speech provision of its State Constitution, as well as the right to petition provision, the case dealt with the right of petition. California Constitution, article 1, § 3 declares: "The people have the right to * * * petition government for redress of grievances". Unlike our constitutional provision, that language says nothing to the effect that "[n]o law shall be passed abridging the rights of the people * * * to petition the government" (NY Const, art I, § 9). Therefore, the California Constitution right of petition clause is considerably broader than that of our State and, in the eyes of the majority of that State's highest court, its language warranted the conclusion (1) that the right to petition in California "is * * * vital to a basic process in the State's constitutional scheme — direct initiation of change by the citizenry through initiative, referendum, and recall" (*Robins v Pruneyard Shopping Center,* 23 Cal 3d 899, 907-908, 592 P2d 341, 345, *supra*), and (2) that such right should be allowed on the private property of a shopping center. While the broad language of the petition provision enabled the California court to avoid any State action requirement and make the quantum leap to a balancing of rights, our Constitution does not permit us to do so.

It should also be observed that the subsequent decision of the United States Supreme Court in *PruneYard Shopping Center v Robins* (447 US 74), does not detract one whit from the argument we have put forth. After the Supreme Court of California

had ruled that the individuals who wished to gather petitions on the shopping center's property had a State constitutional right to do so, the owners of the shopping center appealed to the United States Supreme Court claiming that the California court's determination violated the shopping center owners' property rights under the 5th and 14th Amendments or their free speech rights under the 1st and 14th Amendments. The Supreme Court rejected those contentions.

Obviously, once the California Supreme Court had interpreted its Constitution as bestowing the right on individuals to gather their petitions on private property, the only question left for the United States Supreme Court was whether or not a proper balance had been struck between the conflicting rights of the individuals and the property owners. Such a balance was found to exist. The Supreme Court held that the individuals could exercise the right of speech which the California court had said they possessed under the State Constitution without violating any of the shopping center owner's Federal constitutional rights. But, the United States Supreme Court did not reverse its previous decision in the *Lloyd* case (407 US 551, *supra*), or, in any way, hint that the United States Constitution conferred any free speech rights on the individuals to solicit signatures for their petitions on the private property of the shopping center. The California court had ruled that the individuals had that right and the United States Supreme Court was bound to start its reasoning process with such right having been established.

The reasoning of the Supreme Court of California in the *Robins* case (*supra*), which is predicated on an unacceptable premise vis-à-vis our Constitution, is certainly far less persuasive than that of the United States Supreme Court in the *Lloyd* case (*supra*), which is founded on time-honored principles of constitutional law.

The conclusion we have reached does not mean that now that large shopping centers have sprung up on our landscape, there may not be good cause for the State, in the exercise of its police power, to extend, in some fashion, the citizens' right to exercise freedom of speech on the property of such centers. But, that calls for a delicate balancing of interests, and that balance, as we have said, must be struck by the Legislature rather than the courts. Plaintiffs' "right" to have a forum available to them for dissemination of their leaflets must be reconciled with defendant's rights to realize the full potential of the investment made in its property without significant economic loss or other risk, and the defendant's further interest in not being forced to

jeopardize its free speech rights by forcing it to allow its property to be used to advance political or social causes to which the defendant may be opposed.

In *Murphy v American Home Prods. Corp.* (58 NY2d 293), a majority of the Court of Appeals refused to adopt what it conceded was an emerging view concerning a cause of action in tort for the abusive or wrongful discharge of an employee holding that any such change is best left to the Legislature. In so holding, Judge Jones observed (p 302): "Both of these aspects of the issue, involving perception and declaration of relevant public policy * * * are best and more appropriately explored and resolved by the legislative branch of our government. The Legislature has infinitely greater resources and procedural means to discern the public will, to examine the variety of pertinent considerations, to elicit the views of the various segments of the community that would be directly affected and in any event critically interested, and to investigate and anticipate the impact of imposition of such liability * * * If the rule * * * is to be tempered, it should be accomplished through a principled statutory scheme, adopted after opportunity for public ventilation, rather than in consequence of judicial resolution of the partisan arguments of individual adversarial litigants".

Such an attitude or approach is not limited to new causes of action. For, as stated by the Connecticut court in *Cologne v Westfarms Assoc.* (192 Conn 48, __, 469 A2d 1201, 1210, *supra*): "It is not the role of this court to strike precise balances among the fluctuating interests of competing private groups which then become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications which may arise from the exercise of constitutional rights by some in diminution of those others * * * Unlike first amendment liberties which occupy a preferred status in our constitutional framework * * * property rights or economic interests have long been regarded as subject to reasonable regulation in promotion of the general welfare. For the court to assume such a regulatory function, however, would relegate the legislature to a subordinate role in our governmental scheme. Statutes would become largely obsolete if courts in every instance of the assertion of conflicting constitutional rights should presume to carve out in the immutable form of constitutional adjudication the precise configuration needed to reconcile the conflict. If, as the plaintiffs contend, the development of large suburban shopping centers has greatly diminished opportunities for political advocacy in the public streets of

downtown areas and other public places, the problem should be presented to the legislature. We cannot presume that that body has any less concern for political liberty than this court."

So it is in the situation presented to us by this case. If, upon consideration of the relative interests of the parties involved, the Legislature finds that the public policy of this State requires that individuals such as plaintiffs be afforded a rent-free forum for the dissemination of their ideas upon the private property of some or all of its citizens, that body can enact reasonable regulations so providing. However, any infringement upon the property rights of the citizenry of the State should not be brought about on an ad hoc basis by the courts telling the owner of the property to adopt its own standards of reasonableness which will, in all likelihood, have to be reviewed in subsequent litigation.

For the reasons set forth above, we vote to reverse the order and judgment appealed from, to grant defendant's motion for summary judgment, deny plaintiffs' cross motion for the same relief and to declare that plaintiffs have no constitutional right to distribute leaflets on the defendant's property contrary to the wishes of the defendant.

GIBBONS, J. P., and EIBER, J., concur with BROWN, J; NIEHOFF, J., dissents and votes to reverse the order and judgment and, *inter alia,* to declare that the plaintiffs have no constitutional right to distribute leaflets on the defendant's property, contrary to the defendant's wishes, with an opinion, in which RUBIN, J., concurs.

Order and judgment (one paper) of the Supreme Court, Suffolk County, dated April 4, 1983, affirmed, with costs payable by the appellant.