OPINION OF THE COURT
Chief Judge Cooke.
In enacting the so-called “Shield Law,” the Legislature expressed a policy according reporters strong protection against compulsory disclosure of their sources or information obtained in the news-gathering process. As the statute is framed, the protection is afforded notwithstanding that the information concerns criminal activity and, indeed, even when revealing the information to the reporter might itself be a criminal act. Consequently, in the *246 circumstances here, a subpoena requiring a television reporter to appear before a grand jury investigating the unauthorized disclosure of another grand jury’s report should be quashed.
In April 1982, the Rensselaer County Sheriff suspended a lieutenant and a captain for their alleged involvement in retaining or selling guns that had been turned over to the Sheriff’s Office for destruction. A grand jury was convened to investigate the office. No indictments were issued, but, on October 26, 1982, three reports were handed up to a Supreme Court Justice.
One report was immediately released to the public. Among other things, the report criticized the adequacy of the Sheriff’s supervision and the lack of hiring standards. The other two reports were ordered sealed pursuant to CPL 190.85. The District Attorney revealed that these reports recommended the removal of two unidentified public officials.
Petitioner, a reporter for Station WRGB-TV in Schenectady, was contacted by a source whom he refuses to identify. In return for petitioner’s express agreement to guard the individual’s identity, the source gave information about at least one of the sealed reports. On October 27 and 28, Station WRGB broadcast reports that the Sheriff was one of the public officials whose removal had been recommended.
On November 9, petitioner was served with a subpoena ad testificandum to appear the next day before a Rensse-laer County Grand Jury that was investigating the “disclosure of a certain sealed Grand Jury report.” At that point, no one else had testified or had been subpoenaed before the Grand Jury. Petitioner moved to quash his subpoena on November 10. Before he could serve his papers, the District Attorney disqualified himself because of the possibility that someone in his office was responsible for disclosing the sealed report’s contents. The respondent in this proceeding was appointed as Special District Attorney, and he withdrew the November 9 subpoenas.
*247 Respondent had a subpoena duces tecum issued on January 17,1983, directed to petitioner.[1] The basic thrust of the Grand Jury’s investigation was to determine whether the contents of the sealed report were disclosed by a grand juror or a public official or public employee in violation of section 215.70 of the Penal Law.[2] Petitioner again moved to quash the subpoena, arguing that New York’s Shield Law (Civil Rights Law, § 79-h) provided him with an absolute privilege to keep his source’s identity private. County Court granted petitioner’s motion.
The Appellate Division disagreed and reinstated the subpoena. That court reasoned that, in the present circumstances, the statute was invalid because it impaired a grand jury’s power to investigate public officials (see NY Const, art I, § 6). This court now reverses.
The parties ask us to decide if a reporter may invoke the Shield Law when the very disclosure of information by the confidential source may have been a criminal act. As a preliminary matter, though, it has been suggested that the present proceeding is premature as the Shield Law creates an evidentiary privilege and a protection against contempt orders, but it does not authorize the quashing of grand jury subpoenas.[3] Under the circumstances of this matter, the motion to quash is not inappropriate.
Generally, a grand jury’s power to issue subpoenas is unfettered. An attempt to avoid a subpoena will be successful only if the movant can show that the evidence sought is immaterial or irrelevant, or that “the futility of the process *248 to uncover anything legitimate is inevitable or obvious” (see Matter of Edge Ho Holding Corp., 256 NY 374, 382). As with many rules, application of this principle varies according to the factual context. To the extent that a subpoena seeks testimony, the assertion that the contemplated testimony is subject to a privilege will not usually justify quashing the subpoena (see id., at pp 381-382; Matter of Hirshfield v Craig, 239 NY 98, 118; Matter of Pennock v Lane, 18 AD2d 1043, 1044; 2A Weinstein-Korn-Miller, NY Civ Prac, par 2304.13, p 23-73). In that event, litigation must await such time as when the witness refuses to answer the question on the ground that privileged information is concerned and an attempt is made to compel a response. A different situation prevails when a subpoena seeks the production of documents that are assertedly subject to a privilege. The privilege’s purpose is thwarted if the documents must be revealed before it will be determined whether their contents are protected against disclosure (see Matter of Hirshfield v Craig, supra). Consequently, a subpoena duces tecum may be attacked by a motion to quash before production is made or the witness appears before the Grand Jury (see Matter of Grand Jury Investigation, 59 NY2d 130; 2A Weinstein-Korn-Miller, NY Civ Prac, par 2304.13).
Petitioner’s application to quash the subpoena duces tecum is not premature insofar as the subpoena demanded that petitioner produce his notes, records, and other physical materials that may be privileged under the Shield Law. More troubling is petitioner’s attempt to avoid any appearance before the Grand Jury. As noted, the assertion of a testimonial privilege normally must be withheld until a question is posed. Tile factual setting of the present appeal obviates this requirement. Respondent concedes that the entire focus of the Grand Jury’s inquiry would be on the identity of petitioner’s confidential source and other information that petitioner obtained in the course of his journalistic activities, which would be at least nominally within the scope of the Shield Law’s privilege. All that would be gained by requiring the parties to go through the formality of appearing before the Grand Jury is that a court would have a transcript of petitioner’s giving his *249 name, address, and occupation before refusing to answer any questions.[4] In view of respondent’s explicit concession in our court as to the sole objective of the service of the subpoena on petitioner, it is considered that the ultimate substantive issue presented for resolution is the equivalent of whether petitioner could be punished for contempt in the event of his failure to disclose his source to the Grand Jury.
It bears noting that this is not intended to undermine a grand jury’s power to issue subpoenas, either generally or as to the subpoenas under consideration here. Indeed, it would not have been an abuse of discretion for the courts below to have dismissed as premature the motion to quash insofar as it related to petitioner’s obligation to appear and testify before the Grand Jury.
Having disposed of this procedural point, attention now turns to the merits of petitioner’s assertion that the information sought is protected under section 79-h of the Civil Rights Law.
New York first adopted a Shield Law 14 years ago (L 1970, ch 615). In approving the legislation, Governor Rockefeller stated:
“The bill protects journalists and newscasters from charges of contempt in any proceeding brought under State law for refusing or failing to disclose information or sources of information obtained in the course of gathering news for publication.
* * *
“Freedom of the press is one of the foundations upon which our form of government is based. A representative democracy, such as ours, cannot exist unless there is a free press both willing and able to keep the public informed of all the news.
“The threat to a newsman of being charged with contempt and of being imprisoned for failing to disclose his *250 information or its sources can significantly reduce his ability to gather vital information.” (NY Legis Ann, 197Ü, p 508.)
Over the next few years, a number of courts held that the statute afforded less than an absolute shield (see, e.g., People [Fischer] v Dan, 41 AD2d 687, app dsmd 32 NY2d 764; Matter of Wolf v People, 69 Misc 2d 256, affd 39 AD2d 864; Matter of WBAI-FM, 68 Misc 2d 355, affd sub nom. Matter of WBAI-FM v Proskin, 42 AD2d 5). In 1975, the Legislature reacted by adding a provision prohibiting grand juries from pursuing contempt proceedings against reporters (see L 1975, ch 316). Further judicial circumscriptions of the statute resulted in its further amendment by the Legislature to strengthen its protection for reporters (see L 1981, ch 468). The sponsor of the 1981 bill expressly described its purpose to “correct loopholes and fill gaps in the existing statute” (Memorandum of Assemblyman Steven Sanders, Governor’s Bill Jacket, L 1981, ch 468, p 1). “The original intent of the Legislature in 1970 is to be reinforced, and strengthened. Case history makes it abundantly clear that the courts have been all too often disinclined to follow the letter or even the spirit of the existing law. This bill reinforces the original provisions and expands on them definitively” {id.).
The current statute embodies the Legislature’s intent to grant a broad protection.[5] “News” is defined as “written, *251 oral, pictorial, photographic, or electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare” (Civil Rights Law, § 79-h, subd [a], par [8]). In effect, the statute precludes any body from having a reporter held in contempt, fined, or imprisoned for refusing to disclose news or the identity of a source, regardless of whether the information is highly relevant to a governmental inquiry and whether the information was solicited or volunteered (Civil Rights Law, § 79-h, subds [b], [d]). Moreover, “[a]ny information obtained in violation of the [statute] shall be inadmissible in any action or proceeding or hearing before any agency” (Civil Rights Law, § 79-h, subd [c]).
The inescapable conclusion is that the Shield Law provides a broad protection to journalists without any qualifying language. It does not distinguish between criminal and civil matters, nor does it except situations where the reporter observes a criminal act (see NY Legis Ann, 1970, pp *252 33-34). Although this may thwart a grand jury investigation, the statute permits a reporter to retain his or her information, even when the act of divulging the information was itself criminal conduct. “Even if one were to be in disagreement with the wisdom of the policy underlying section 79-h and no matter how heinous the crime under investigation, the courts are not free to ignore the mandate of the Legislature and substitute a policy of their own” (Matter of WBAI-FM v Proskin, 42 AD2d 5, 10, supra [Cooke, J., dissenting]; see Matter of City Council v Goldwater, 284 NY 296, 302).
It is conceded that the information sought from petitioner comes within the scope of the Shield Law and, if no exceptions exist, then the statutory protection applies. Respondent contends that, in the immediate situation, section 79-h is invalid because it runs afoul of the constitutional proscription against laws that suspend or impair a grand jury’s power to inquire into willful misconduct by a public officer (NY Const, art I, § 6).[6] This is not persuasive.
At the outset, it must be remarked that the Grand Jury investigation here is not necessarily one into willful misconduct by a public officer. In its lengthy list of persons subject to criminal sanctions for unlawful Grand Jury disclosure, section 215.70 of the Penal Law includes public officers, public employees, and grand jurors, whose status is probably not that of “public officer.” Thus, the Grand Jury’s attempt to ascertain who divulged the contents of the sealed report may result in the discovery of willful misconduct by a public officer, but it may just as readily determine that someone other than a “public officer” was the transgressor.
The constitutional provision against impairing a grand jury’s power was not intended to prevent the Legislature from creating evidentiary privileges or their equivalent that have an incidental impact on investigations into willful misconduct by public officers. This court long ago noted that “the proposal was advanced solely for the purpose of *253 making certain that the Legislature of this State would never be able to * * * take from the grand jury its authority to investigate and indict for alleged criminal acts by public officials” (Matter of Wood v Hughes, 9 NY2d 144, 150 [emphasis added]). The particular events that triggered the amendment were “[t]hat at a special session of the [Pennsylvania] Legislature a statute was adopted suspending the grand jury investigation into a public official, and depriving the grand jury of the power to act in the matter” (3 Rev Record of Constitutional Convention of 1938, p 2572). The sponsor’s concern was stated on the record (id., at pp 2570-2571):
“We have had, within the last few weeks, the experience in a sister state of the legislature, acting together with the Governor, halting a grand jury investigation into a public official’s misconduct on the theory that the legislature would investigate itself and its own officials, and that the grand jury would be deprived of the power to do so or at least its power would be suspended.
“The function of grand juries in the investigation of the misconduct of public officials is one of the most important functions served by the grand jury system today. The existence of an independent agency drawn from the citizenry at large for that purpose is one of the most estimable features of the American system of government. It has served well. Recent experience has demonstrated that * ⅜ ⅜ it is not beyond the reach of legislative interference. And the purpose of this amendment is to protect, at least, that function of the grand jury against legislative interference.
“ * ⅜ * If a state as highly civilized as the State of Pennsylvania, having substantially the same type of cosmopolitan population as the State of New York, can undertake to do what the legislative body and the Governor of that state undertook to do, we ought here and now in our State guarantee that nothing of that kind can ever happen in New York State.”
Nothing suggests that the drafters intended to abrogate evidentiary privileges, or protections such as are afforded by the Shield Law, at least not where the result would only indirectly hinder a grand jury’s power to investigate.
*254 Indeed, under respondent’s argument, all statutory restrictions on a grand jury’s ability to investigate public officers would be invalid. Thus, the spousal, attorney-client, physician-patient, clergy, psychologist, and social worker privileges (CPLR 4502-4505, 4507, 4508) would all be ineffective.[7] Similarly, a grand jury investigating corruption would be able to give complete immunity to private citizens who have engaged in bribery or extortion, regardless of a prosecutor’s desire to obtain waivers (cf. CPL 190.50, subds 3, 4). Finally, to the extent that the normal rules of evidence are applicable to grand juries (CPL 190.30, subd 1), a question might be raised as to their force when they operate to “impair” an investigation of a public officer.
There can be no question that the drafters of the 1938 amendment to section 6 of article I did not intend the consequences that would result from this hypertechnical interpretation of “impair or suspend.” That language was meant to prevent legislation that directly restricts a grand jury’s right to inquire or that, although facially neutral, would have its primary impact by limiting investigations of public officers. The Shield Law is not such a statute. Its impact on investigations of public officers is incidental. It is, therefore, constitutionally valid.
Petitioner and some of the amici curiae invite the court in this case to enunciate a reporter’s privilege under the State Constitution’s guarantee of freedom of the press (NY Const, art I, § 8), which would exist wholly apart from the statutory privilege. This the court declines to do. Courts should not decide constitutional questions when a case can be disposed of on a nonconstitutional ground (see People v Felix, 58 NY2d 156, 161; People v Carcel, 3 NY2d 327, 330; Matter of Peters v New York City Housing Auth., 307 NY 519, 527; Holroyd v Town of Indian Lake, 180 NY 318, 325).
Accordingly, the order of the Appellate Division should be reversed, with costs, and the motion to quash the subpoena should be granted.

. Subpoenas duces tecum were also issued to petitioner’s employer in both November 1982 and January 1983. The parties have not directed their arguments to these subpoenas, and they do not appear to be at issue in this proceeding. In any event, the employer may claim any benefit of the Shield Law held by petitioner (see Civil Rights Law, § 79-h, subd [e]).

. Section 215.70 of the Penal Law provides:
“A person is guilty of unlawful grand jury disclosure when, being a grand juror, a public prosecutor, a grand jury stenographer, a grand jury interpreter, a police officer or a peace officer guarding a witness in a grand jury proceeding, or a clerk, attendant, warden, or other public servant having official duties in or about a grand jury room or proceeding, or a public officer or public employee he intentionally discloses to another the nature or substance of any grand jury testimony, or any decision, result or other matter attending a grand jury proceeding which is required by law to be kept secret, except in the proper discharge of his official duties or upon written order of the court. Nothing contained herein shall prohibit a witness from disclosing his own testimony.
“Unlawful grand jury disclosure is a class E felony.”

. The full text of section 79-h of the Civil Rights Law is set forth in footnote 5, infra.

. The dissent’s assertion that petitioner could be asked whether his source was a public officer relies on the premise that the statute protects against the disclosure only of “sources of news”; it fails to recognize the protection against the disclosure of “news” itself, which is broadly defined (see pp 250-251, and n 5, infra). Certainly, the official status of the source is relevant information of public interest falling within the definition of “news.” For example, in another situation, it would be of great interest that an unaccredited revelation about foreign affairs came from the Secretary of State rather than a mail clerk.

. In its entirety, section 79-h of the Civil Rights Law provides:
“(a) Definitions. As used in this section, the following definitions shall apply:
“(1) ‘Newspaper’ shall mean a paper that is printed and distributed ordinarily not less frequently than once a week, and has done so for at least one year, and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest, has a paid circulation and has been entered at United States post-office as second-class matter.
“(2) ‘Magazine’ shall mean a publication containing news which is published and distributed periodically, and has done so for at least one year, has a paid circulation and has been entered at a United States post-office as second-class matter.
“(3) ‘News agency’ «hall mean a commercial organization that collects and supplies news to subscribing newspapers, magazines, periodicals and news broadcasters.
“(4) ‘Press association’ shall mean an association of newspapers and/or magazines formed to gather and distribute news to its members.
“(5) ‘Wire service’ shall mean a news agency that sends out syndicated news copy by wire to subscribing newspapers, magazines, periodicals or news broadcasters.
“(6) ‘Professional journalist’ shall mean one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public; such person shall be someone performing said function either as a regular employee or as one *251 otherwise professionally affiliated for gain or livelihood with such medium of communication.
“(7) ‘Newscaster’ shall mean a person who, for gain or livelihood, is engaged in analyzing, commenting on or broadcasting, news by radio or television transmission.
“(8) ‘News’ shall mean written, oral, pictorial, photographic, or electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare.
“(b) Exemption of professional journalists and newscasters from contempt. Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster presently or having previously been employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmission station or network or other professional medium of communicating news or information to the public shall be adjudged in contempt by any court, the legislature or other body having contempt powers, nor shall a grand jury seek to have a journalist or newscaster held in contempt by any court, legislature or other body having contempt powers for refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, or for broadcast by a radio or television transmission station or network or for public dissemination by any other professional medium or agency which has as one of its main functions the dissemination of news to the public, by which he is professionally employed or otherwise associated in a news gathering capacity notwithstanding that the material or identity of a source of such material or related material gathered by a person described above performing a function described above is or is not highly relevant to a particular inquiry of government and notwithstanding that the information was not solicited by the journalist or newscaster prior to disclosure to him.
“(c) Any information obtained in violation of the provisions of this section shall be inadmissible in any action or proceeding or hearing before any agency.
“(d) No fine or imprisonment may be imposed against a person for any refusal to disclose information privileged by the provisions of this section.
“(e) The privilege contained within this section shall apply to supervisory or employer third person or organization having authority over the person described in this section.”

. Section 6 of article I provides in pertinent part: “The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law.”

. Of course, to the extent that a privilege is necessary to sustain Federal constitutional protections, such as the right to effective assistance of counsel, it would persist.