Bellacosa, J.
(dissenting). By enactment of a strong Shield Law (Civil Rights Law § 79-h) protecting sources and materials gathered from news sources, New York became the first State to broadly enhance the root freedom of the press right, itself traceable to the free press provision of the New York Constitution (art I, § 8). New York should not, through its judiciary, encumber the plain legislative policy choices made in the governing statute’s own words. Since the majority’s holding does that, I dissent.
*161 The District Attorney’s effort to penetrate that shield by subpoena to acquire outtakes of a televised news item should not be judicially enforced because confidentiality in the gathering of the news from a news source should not be added by Judges as a condition to the invocation of New York’s Shield Law protections. That judicial gloss transforms the statute. Indeed, the majority opinion cannot disguise what it effects by "interpretation”, "judicial construction” and "legislative intent”. They functionally enact their own amendment to the core provision of the Shield Law by striking the word "any” and substituting the word "some”, so that the protection is now only afforded to "some news” rather than "any news”, as the Legislature enacted it and as the Governor signed it into law. The statutory language, its legislative history, and our recent precedents involving the Shield Law, all buttress the analysis which should result in reversal and quashing of the subpoena.
The majority’s holding produces a classic irony. New York State’s judiciary, which should be the bastion of protection of this right afforded by the elected representatives of the people of this State, instead chills that right by inserting its own confidentiality clause into an unqualified statute. Their holding may be reduced to this syllogism: (1) the lower courts put confidentiality into the statute; (2) the judiciary then says that the Legislature did not take it out; and (3) the judiciary finally declares that the Legislature put it in in the first place.
The Appellate Division in this case observed that, subsequent to initial enactment, the Shield Law was judicially interpreted as guarding from disclosure material which was received only under a cloak of confidentiality. The court then reasoned that a 1981 amendment to the statute did not eliminate the judicially fashioned cloak of confidentiality since, in an earlier study bill draft, the amendment proposed a provision expressly eliminating the confidentiality requirement which was not present in the version passed into law two years later. In cases after the passage of the amendment, the Appellate Divisions still regarded the judicially created confidentiality requirement as still constituting an element to the invocation of the privilege (Oak Beach Inn Corp. v Babylon Beacon, 92 AD2d 102, affd 62 NY2d 158; Matter of Pennzoil Co., 108 AD2d 666; People v Korkala, 99 AD2d 161; Hennigan v Buffalo Courier Express Co., 85 AD2d 924).
Relying on the reasoning of People v Korkala (99 AD2d 161, *162 supra), the court below concluded that in light of the judicial construction of the Shield Law at the time of the 1981 amendment, an intention to alter that construction would not be imputed to the Legislature (id., at 166). The Appellate Division also found persuasive a memorandum by the Attorney-General, which was received by the Governor after he signed the 1981 amendment into law. In material part, the Attorney-General stated: "this version does not protect journalists from * * * contempt for failure to divulge requested information [which] * * * is not confidential” (Mem of Attorney-General, July 8, 1981, Governor’s Bill Jacket, L 1981, ch 468).
The controlling rule of statutory construction is that a court should look first to the particular statutory language and be guided by its natural and most obvious meaning (see, Matter of Monarch Elec. Contr. Corp. v Roberts, 70 NY2d 91, 97; Matter of Capital Newspapers v Whalen, 69 NY2d 246, 251; Price v Price, 69 NY2d 8, 15; Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459; Association of Contr. Plumbers v Contracting Plumbers Assn., 302 NY 495, 500). "[I]f there is nothing to indicate a contrary intent, terms of general import will ordinarily be given their full significance without limitation” (Price v Price, 69 NY2d 8, 15, supra; see also, Matter of Board of St. Opening, 133 NY 329, 333-334). The Shield Law exempts professional journalists and newscasters from being held in "contempt by any court, legislature or other body having contempt powers for refusing or failing to disclose any news or the source of any news” (Civil Rights Law § 79-h [b] [emphasis added]). This operative clause of the Shield Law has not changed since the statute’s initial enactment in 1970.
The statute unequivocally protects the media from disclosure of "any” news or news source. We have long recognized that the word "any” imports no limitation (Matter of Beach, 154 NY 242, 247), that "[a]ny is an all-exclusive word” (Randall v Bailey, 288 NY 280, 285), and that it "means 'all’ or 'every’ ” (Zion v Kurtz, 50 NY2d 92, 104). This construction of the plain, unqualified term "any” would also be consistent with judicial interpretations from other States of their own shield laws protecting "any” news, information or source (see, Austin v Memphis Publ. Co., 655 SW2d 146, 150 [Tenn]; Grand Forks Herald v District Ct, 322 NW2d 850, 854 [ND]; Playboy Enters. v Superior Ct., 154 Cal App 3d 14, 22, 201 Cal Rptr 207; Hammarley v Superior Ct, 89 Cal App 3d 388, 397, 153 Cal Rptr 608).
*163 There is no ambiguity in the language of New York’s statute. In fact, the District Attorney concedes that the statute, on its face, is unqualified and does not explicitly provide that news acquired only in confidence is protected (respondent’s brief, at 11, 22). Nonetheless, he argues and the majority accepts that a confidentiality requirement is a part of the Shield Law protections because it is part of other evidentiary privileges. The argument would have the courts incorporate confidentiality by reference.
I cannot accept that premise and that argument because each of the analogized privileges is set forth in CPLR article 45, entitled "Evidence”, and each contains an express confidentiality component designed to confer a privilege on the utterer. The Shield Law, on the other hand, is contained in the Civil Rights Law, indicative of a legislative intent to differentiate and to treat uniquely this statutory enhancement of the State and the Federal constitutional protections of a free press. Distinctly contrary to other privileges, the Shield Law is designed to confer its unqualified privilege on the listener, the public transmitter of the information as news.
We have also long recognized that "a particular construction of a statute should be preferred which furthers the statute’s objective, spirit and purpose” (Price v Price, 69 NY2d 8, 16, supra; Matter of Petterson v Daystrom Corp., 17 NY2d 32, 38-39; Matter of New York Post Corp. v Leibowitz, 2 NY2d 677, 685-686). The legislative history of the Shield Law as of the time of its initial enactment, and of the subsequent amendments reacting to certain judicial constructions, establishes that no qualification of confidentiality was ever legislatively adopted or ratified.
Enacted in 1970, it was described as making New York "the only State that clearly protects the public’s right to know and the First Amendment rights of legitimate [professional journalists and newscasters]” (Governor’s Approval Memorandum, 1970 NY Legis Ann, at 508). It was specifically stated in the Approval Memorandum that the information protected included all "written, oral, and pictorial information and communications” (id.). Taken as a whole, the legislative history of this initial enactment displays a firm conviction by the Legislature and the Governor to shield journalists and newscasters from being compelled to reveal any information, material, or sources. There is nothing in the legislative history cloaking the privilege with confidentiality.
*164 Virtually every State court case construing the Shield Law between the date of enactment and its subsequent amendments in 1975 and 1981 nevertheless added, as a judicial overlay, the requirement of confidentiality (see, Phelan, Beach v Shanley: An Expansive Interpretation of New York’s "Shield Law”, 49 Alb L Rev 748, 764 [1984-1985]). Yet, this is the first opportunity this court has had to address that precise issue.
The Legislature took steps in the interim to strengthen the Shield Law and to overcome, where it found it necessary, the constructions that were being applied by the courts. In 1975, the Legislature added an ingredient pertaining to Grand Juries (L 1975, ch 316, § 1). Subsequently, in 1981, three other significant changes were made. The class of protected persons was expanded to include free-lance journalists and broadcast media; information acquired in violation of the statute was made inadmissible as evidence; and the newspersons’ protection was expanded to include information which was not solicited by the newspersons (L 1981, ch 468).
The legislative history which accompanied these amendments reveals that the Legislature understood the Shield Law, as originally enacted, to afford an unqualified privilege to journalists and newscasters, and that the amendments were intended to fortify the original intent (see, Mem in Support, 1975 NY Legis Ann, at 38). The Memorandum in Support of the 1981 amendment explains that the purpose of the bill is to "correct loopholes and fill gaps in the existing statute”, "guarantee[ ] absolute coverage for persons professionally engaged in a news gathering capacity”, and "grant[ ] the journalist sole determination as to when that protection may be waived” (1981 NY Legis Ann, at 257). The Memorandum noted that "[c]ase history makes it abundantly clear that the courts have been all too often disinclined to follow the letter or even the spirit of existing law” (id., at 257). The sponsor’s Memorandum of Support even added in prescient terms: "in the event (entirely expected) that the courts, (irrespective of this bill’s attempt to fill case-by-case, precedent-by-precedent the gaps and established loopholes of the existing statute by use of strengthened language) still arrogate to themselves the power to pierce the absolute privilege of confidentiality for journalists so intended by the Legislature, then such information forced disclosed is to be declared incompetent” (id., at 258). Evidencing a desire to champion the intended free press objectives of the statute over the grudging judicial constructions applied to it, the Memorandum in Support proclaimed *165 that "[i]t is in the interests of society as a whole that the Legislature mandate absolutely and without qualification the protection of journalists from being compelled to produce information or reveal sources” (id., at 258). Moreover, in the Senate floor debate concerning the amendment which took place immediately prior to its overwhelming passage, the Shield Law was described as "the law that allows the press not to disclose their sources and information” and the amendment as "merely solidifying] the original intent of the law and correcting those areas which have been pierced by court decisions” (NY State Senate Stenographer’s Record, Regular Session 1981, at 4957).
Interestingly, in the period between enactment of the 1981 amendment and this court’s decision in 1984 in Matter of Beach v Shanley (62 NY2d 241), some trial courts began themselves to pull back from the confidentiality requirement, noting that it never did encumber the plain protections afforded by the statute even in its original enactment (see, People v Iannaccone, 112 Misc 2d 1057; Lawless v Clay, 9 Media L Rep 1223 [BNA]; Wilkins v Kalla, 118 Misc 2d 34; CBA Elecs. v Ellenberg, 10 Media L Rep 1095 [BNA]). The Appellate Divisions, on the other hand, adhered to their view that the Shield Law contained a cloak of confidentiality (Hennigan v Buffalo Courier Express Co., 85 AD2d 924, supra; People v Korkala, 99 AD2d 161, supra; Matter of KnightRidder Broadcasting v Greenberg, 119 AD2d 68; Matter of Pennzoil Co., 108 AD2d 666, supra).
Legislative inaction, in any event, with respect to a facially plain core provision should not prevail to bring about a result contrary to the enacted legislative language (Matter of Heller-stein v Assessor of Town of Islip, 37 NY2d 1, 10, 13). Additionally, this court, in its decisions in Oak Beach Inn Corp. v Babylon Beacon (62 NY2d 158, supra) and Matter of Beach v Shanley (62 NY2d 241, supra), provided a fresh sense of direction which should have been persuasive in deciding this case.
We quashed a subpoena in Matter of Beach v Shanley (supra) relying on the plain meaning of the Shield Law and the legislative intent behind its original enactment and subsequent amendments. We observed that "the statute precludes any body from having a reporter held in contempt, fined or imprisoned for refusing to disclose news or the identity of a source, regardless of whether the information is highly rele *166 vant to a governmental inquiry and whether the information was solicited or volunteered” (Matter of Beach v Shanley, 62 NY2d 241, 251, supra). We stated that "[t]he inescapable conclusion is that the Shield Law provides a broad protection to journalists without any qualifying language” (id., at 251 [emphasis added]). The conclusion reached upon application of this rule to the facts there was that "[although this may thwart a Grand Jury investigation, the statute permits a reporter to retain his or her information, even when the act of divulging the information was itself criminal conduct” (id., at 252; see also, Matter of Stern v Morgenthau, 62 NY2d 331, 335).
On the same day. as Beach (supra), in Oak Beach Inn Corp. v Babylon Beacon (62 NY2d 158, supra), we dealt with the Shield Law in a civil context. We held that "[t]he Shield Law’s unqualified immunity from contempt granted to journalists who refuse to disclose their sources, would preclude a court from employing that remedy against such a journalist in a civil case, even in those rare instances where it might otherwise be considered the only appropriate or effective remedy” (Oak Beach Inn Corp. v Babylon Beacon, 62 NY2d 158, 166, supra [emphasis added]).
Continued reliance by the majority and courts below on the letter of the Attorney-General in interpreting the 1981 amendment should not be controlling or even persuasive. That opinion came after Governor Carey signed the amendment into law and, thus, does not reflect information before either the Governor or the Legislature. Moreover, the materials in the Bill Jacket overwhelmingly support the view that the Shield Law does provide an unqualified privilege. The Attorney-General’s letter standing alone is insufficient, even if it had been timely, to supplant the language of the statute itself. Simply put, that letter is not even part of the legislative history and is essentially irrelevant in this case for that very reason.
With respect to the majority opinion, it suffices to express a view only as to several of its fundamental flaws.
It twice asserts (at 155,158) that the courts should not substitute their policy views for those of the Legislature. The irony of that assertion is that that is precisely what the majority is doing and what the courts have persistently done by imposing a confidentiality requirement when the Legislature has clearly not done so in the statute itself (Lane, Legislative Process and *167 Its Judicial Renderings: A Study .in Contrast, 48 U Pitt L Rev 639 [1987]).
It violates a threshold statutory construction rule when it proceeds directly to a discussion of legislative history without addressing or even quoting the plain language of the statute (id., at 652). Their reliance on the principle and cases noting legislative acquiescence by awareness of judicial interpretations is rebuffed by our direct holding in the classic case of Matter of Hellerstein v Assessor of Town of Islip (37 NY2d 1, 10 [per Wachtler, J.], supra) where we said: "the application of this principle [of legislative acquiescence] presupposes first, that the statute is capable of more than one interpretation, and secondly, that our court has not previously resolved the ambiguity”. Neither of those two conditions is present to make the majority’s major premise operative in this case.
It inexplicably gives the Attorney-General’s 1981 opinion significant impact on this case. That opinion came after the bill was enacted and it comes from an official who has absolutely nothing to do with the enactment process or the interpretative process.
Finally, the majority uses bootstrapping by referring to a "well-settled rule of confidentiality” for over a decade in this State. This cannot be the same rule that has been hotly debated in the Legislature, vigorously litigated in the courts, persistently contested by the media over the past 17 years, and sharply divides this very court by a 4-3 vote. Then, these remarkable coups de grace are delivered in that respect: (1) the negative legislative intent concerning the 1981 amendments is immunized from the fact that this court at that time had never even passed on the issue and the majority adds that this court’s silence is of no great weight anyway in determining what the Legislature failed to do with respect to a judicial artifact of confidentiality; and (2) most astonishing of all, the majority asserts that this court’s only clear statements on the subject, when they finally did emerge in 1984 in two cases, are of no consequence and are relegated to a denigrating end-piece footnote in the majority opinion. Stare decisis and respect for our own words and for this court’s rank as the ultimate interpretative policy voice seems absent here.
The Legislature of this State has made a very significant policy decision that the interests of the public would be best served by allowing newspeople to protect their materials and sources even if it impedes a criminal investigation and this *168 court has endorsed that policy (see, 1970 NY Legis Ann, at 33, 508; see also, Matter of Beach v Shanley, 62 NY2d 241, 251, supra; Matter of Stern v Morgenthau, 62 NY2d 331, 335, supra), up to today. The policies and the precedents are good ones and the courts should not reverse course and constrict the plain policy choice enacted by the Legislature in the statute’s own words which have not been changed in the key formulation since first passage.
I believe it is unwise for the judiciary to transmogrify newspeople into agents of the government to collect evidence, and I would reverse and quash the subpoena.
Judges Simons, Titone and Hancock, Jr., concur with Judge Alexander; Judge Bellacosa dissents and votes to reverse in a separate opinion in which Chief Judge Wachtler and Judge Kaye concur.
Order modified, with costs to respondent, to the extent of dismissing the motion to quash for mootness and, as so modified, affirmed. Certified question answered in the negative.