Hancock, Jr., J.
(dissenting). A compelling theme has persisted in New York jurisprudence from colonial times.[1] It reflects the deeply rooted concern in our State for safeguarding expression-related freedoms. The wording of the State Constitution, we have noted, is more expansive than the First *632 Amendment[2] of the United States Constitution (see, O’Neill v Oakgrove Constr., 71 NY2d 521, 528-529, and at 531 [Kaye, J., concurring]) and we have maintained a consistent tradition of providing the broadest possible protection of such freedoms, "often broader than the minimum required by the First Amendment” (O’Neill v Oakgrove Constr., supra, at 529, n 3; see, People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557-558). Today, however, in a seeming break with this constant theme, the court applies a narrow interpretation of article I, §§ 1, 8 and 9 of our State Constitution — one which appears to afford decidedly less protection to expressional and associational freedoms than the First Amendment.
It upholds a Charter provision which cuts sharply into two liberties which are clearly protected under the First Amendment and which, under our established New York tradition, should be entitled to the same, if not greater, protection under article I, §§ 1, 8 and 9: (1) the freedom of association of political parties and their adherents; and (2) the expressional and associational rights of candidates for political office and of the voters who might support and vote for them (see, e.g., Illinois Elections Bd. v Socialist Workers Party, 440 US 173, 184; Bullock v Carter, 405 US 134, 142-144; see also, Clements v Fashing, 457 US 957, 986, n 8 [Brennan, J., dissenting]). And the court reaches its conclusion by avoiding the application of any level of scrutiny — strict or otherwise. It simply brushes aside as meaningless the serious invasion of plaintiffs’ freedoms of association and expression. No authority has been cited for the propositions that an invasion of a political party’s freedoms of this magnitude can properly be ignored as creating no impairment of constitutional rights (majority opn, at 628) or that a provision restricting the pool of available candidates and party leaders can in some way "broaden” participation in government, rather than "restrict[ ] associational or expressional freedoms.” (Majority opn, at 631.) As to the invasion of the rights of candidates and voters, the majority concedes that if protected rights are burdened, strict scrutiny must be applied (id.). Nevertheless, it seemingly concludes that strict scrutiny analysis is not required on the ground that whatever burden is imposed is "de minimis” and "justified by *633 the important governmental interests underlying it” (id., at 630). To my knowledge, the court’s responses to these constitutional challenges have no support in analogous case law or in recognized authorities (see generally, Tribe, American Constitutional Law § 12-26, at 1010-1022 [2d ed]).[3] For these reasons and others which follow, I dissent.
I
The parties to this lawsuit espouse decidedly different views on the necessity for section 2604 (b) (15) and the extent to which it serves governmental interests. Regardless of these differences, one thing is certain: if it constitutes a significant intrusion on the freedoms of expression and association guaranteed under our State Constitution, it cannot be upheld unless it is found to serve a compelling governmental interest under strict scrutiny (see, Eu v San Francisco Democratic Comm., 489 US 214, 222; majority opn, at 627-628).
A
There can be no question that political parties have a constitutional right to be free from governmental interference with their internal affairs.[4] This fundamental right — which *634 stems from the parties’ constitutionally protected freedom of association (see, Democratic Party v Wisconsin, 450 US 107, 122-124; Kusper v Pontikes, 414 US 51, 56-58; Tribe, American Constitutional Law, at 790-791 [2d ed 1988]) — includes the freedom of a political party to choose its own leaders (see, Eu v San Francisco Democratic Comm., 489 US, at 223-229, supra) and select its own candidates (Tashjian v Republican Party, 479 US 208, 214-217). In Eu v San Francisco Democratic Comm. (supra, at 224), Justice Thurgood Marshall summarized the principle in these words: "It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments. [Citations omitted.] Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, [citations omitted], but also that a political party has a right to ' "identify the people who constitute the association,” ’ [citations omitted], and to select a 'standard bearer who best represents the party’s ideologies and preferences.’ ”
Section 2604 (b) (15) prohibits any party member who happens to hold one of several important party positions from serving in elective political office. Unquestionably, this prohibition infringes on the rights of political parties and their adherents to select and elect candidates of their choice to positions in city government (see, Tashjian v Republican Party, supra, at 214-217). Nor can it be doubted that section 2604 (b) (15), by precluding elected officers and virtually all important appointed officials from holding any one of several significant party positions (e.g., county leader, officer of the county committee, national or State committeemen), abridges the associational rights of parties concerning "decisions about the identity of * * * [their] leaders.” (See, Eu v San Francisco Democratic Comm., supra, at 229.)[5]
*635 The majority holds, nevertheless, that because the provision only prohibits elected officials and certain important appointed officers from holding significant party positions — and does not expressly speak to any limitations on the party itself — there is no burden on the party’s associational rights (see, majority opn, at 628-630). The argument elevates form over substance, for the effect is the same whether the prohibition results from a measure which prevents elected and appointed officials from holding party office or whether it prevents the party from choosing these officials for party positions. Moreover, the contention squarely contradicts established authority to the effect that indirect restrictions may effect associational freedoms and require strict scrutiny analysis in the same way as restrictions which are direct (see, Elrod v Burns, 427 US 347; Buckley v Valeo, 424 US 1, 64-65). Indeed, as Justice Brennan stated in Elrod (supra, at 362): "It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. Buckley v. Valeo, 424 U. S., at 64-65; NAACP v. Alabama, 356 U. S. 449, 460-461 (1958). 'This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government’s conduct. * * *’ Buckley v. Valeo, supra, at 65. Thus encroachment 'cannot be justified upon a mere showing of a legitimate state interest.’ Kusper v. Pontikes, 414 U. S., at 58. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest.” (Emphasis added.)
In my opinion, section 2604 (b) (15) necessarily constitutes a serious impairment of the constitutional freedoms of political parties. The challenged provision does not merely involve the government’s broad power to regulate the time, place and manner of elections. This provision clearly diminishes the pool *636 of persons available to the party from which it may choose its representatives. Can there be any measure which encroaches more directly on the core freedom of a political party than one which restricts — on the basis of the candidate’s activities within the party — a political party’s power to perform the primary function for which it exists: the selection, nomination and election of persons who, in its opinion, are best suited to represent the party as candidates? And can any measure more surely curtail the autonomy of a political association than one which forces it to choose between using its talented advocates to direct its own affairs and using them to carry out its policies and public objectives as candidates for political office? But, regardless of how it is viewed, the debasement of these constitutional prerogatives of political parties is unquestionably significant. That being so, there is no way — consistent with established precedent (see, e.g., Elrod v Burns, supra)— that section 2604 (b) (15) can be upheld except by holding that it passes strict scrutiny.
Nor can it be an acceptable answer to the complaint of the political parties that section 2604 (b) (15) markedly reduces their freedom to select candidates and leaders to say to them that they need not be concerned because the section "simply puts high officials in public parties to a choice: whether to retain their high public office and abstain from holding political party positions or the converse.” (Amici brief, at 21 [emphasis added]; see, majority opn, at 629.) Defendants’ proposition, apparently, is that such a deprivation is of no consequence because nothing prevents a party from nominating a candidate who has been a high party official in the past or prevents it from choosing as one of its top party leaders someone who formerly held an elective or important appointed city position.
In short, the argument is that the section merely precludes a party from vesting the responsibilities of candidacy and high party office in the same person at the same time. But the argument overlooks a key point: the very person who the party believes is best suited to carry its standard as a candidate may be one of its prominent party leaders and the party’s interest may be best served by having this chosen candidate retain the party position.[6] It is precisely this right of *637 the political party to make such a choice — regardless of its wisdom — which the constitutional freedom of association guarantees (see, Eu v San Francisco Democratic Comm., supra, at 222-223; Tashjian v Republican Party, supra, at 214; Cousins v Wigoda, 419 US 477, 487). Section 2604 (b) (15) denies to the parties the right to do so.
Not surprisingly, no case has been cited for the proposition that a standard of review less than strict scrutiny should be applied to curtailments of associational freedoms of political parties of the type in question here. Moreover, to my knowledge, no court has upheld comparable restrictions under any standard. There is, however, substantial authority to the contrary. In Eu v San Francisco Democratic Comm. (supra), for example, the Supreme Court, applying strict scrutiny, invalidated various provisions of the California Election Code as violative of the basic rights of political parties to choose their own candidates and leaders. The court stated (supra, at 230): "By requiring parties to establish official governing bodies at the county level, California prevents the political parties from governing themselves with the structure they think best. And by specifying who shall be the members of the parties’ official governing bodies, California interferes with the parties’ choice of leaders. A party might decide, for example, that it will be more effective if a greater number of its official leaders are local activists rather than Washington-based elected officials. The Code prevents such a change.” (Emphasis added; see also, Tashjian v Republican Party, supra, at 214-217; Geary v Renne, 911 F2d 280 [9th Cir 1990].) Indeed, 80 years ago, our Court, in Matter of Callahan (200 NY 59), recognizing the fundamental principle that a party "has the right to choose whom it will for its candidate for office and to appeal to the whole electorate for votes in his behalf’ (id., at 61), invalidated a statute which curtailed that right (see also, Matter of Hopper v Britt, 204 NY 524, 530-532).
Defendants’ reliance on Civil Serv. Commn. v Letter Carriers (413 US 548) is misplaced. Far from holding that the limitations on Federal employees’ First Amendment rights imposed by the Hatch Act should be tested under a "rational basis” test, the court there found the aim of keeping Federal executive employees separate from partisan politics to be "in the best interest of the country, indeed essential” (413 US, at 557) *638 and the court traced the history of the separation principle through the centuries (id., at 557-559). Unlike the asserted governmental interest here in preventing corruption by political and public officials, Letter Carriers — as this Court has previously recognized — involved the government’s interest as an employer in ensuring the stability and efficiency of its civil service arm (see, Evans v Carey, 40 NY2d 1008, 1009; see also, Matter of Curie v Ward, 46 NY2d 1046, 1052-1053 [Wachtler, J., dissenting]). Moreover, as Justice Brennan later explained in Elrod v Burns (427 US 347, supra): Letter Carriers upheld Hatch Act restraints "sacrificing political campaigning and management, activities themselves protected by the First Amendment [because] it was the Court’s judgment that congressional subordination of those activities was permissible to safeguard the core interests of individual belief and association.” (Id., at 370-371 [emphasis supplied].) Unlike Letter Carriers, here the infringement of plaintiffs’ associational rights cannot be said to be counterbalanced by any offsetting infringement of fundamental rights of others.
It is true that minimal restrictions and limitations on the methods of organizing political parties and reasonable regulations as to the time, place and manner of selecting party candidates and leaders have been allowed (cf., Anderson v Celebrezze, 460 US 780 [Ohio’s candidacy early filing deadlines held unconstitutional]). But such measures have been upheld only because they served the purpose of assuring the fairness, stability and integrity of the process and, therefore, could be found to further compelling interests of the State under strict scrutiny (see, Eu v San Francisco Democratic Comm., supra, at 229-231; and see, e.g., Rosario v Rockefeller, 410 US 752 [sustaining New York Election Law provision requiring voter to enroll in party of choice at least 30 days before general election to vote in primary]; Marchioro v Chaney, 442 US 191 [restricting size and composition of State committee]).
In contrast to such cases, the regulation here is not established for the purpose of assuring the fairness, stability or integrity of the process of selecting candidates or party leaders (see, Eu v San Francisco Democratic Comm., supra, at 229-231; Storar v Brown, 415 US 724, 730-733; Tribe, American Constitutional Law § 13-22 [2d ed]). The very purpose of section 2604 (b) (15) is to regulate who the candidates and party leaders should be, not how they should be chosen. The theory of the legislation is simply this: that corruption and conflicts of interest will be prevented by curtailing the parties’ rights to *639 choose their candidates and leaders through a measure which makes it impossible for them to nominate any of their leaders for elective office or to select for one of their party leadership positions any elected officer or prominent appointed city official.
Cases such as Matter of Rosenstock v Scaringe (40 NY2d 563) and Clements v Fashing (457 US 957, supra) are not on point. They do not involve complaints brought by political parties for alleged violations of their associational rights to be free from governmental control (see, e.g., Cousins v Wigoda, supra, at 487; Buckley v Valeo, 424 US 1, 15, supra). Rather, these cases involve complaints brought by individuals, as in Rosenstock (supra), where a challenge was brought against a statute, on equal protection grounds, because it restricted a person’s right to serve on a board of education. And in Clements — an action brought by officeholders challenging restrictions on the right to seek election to other offices during incumbents’ current terms — the court, in upholding the restrictions, specifically noted that the provisions did not preclude the plaintiffs from holding offices in a political party (Clements v Fashing, supra, at 972). Thus, contrary to the majority view (majority opn, at 628), section 2604 (b) (15) abrogates fundamental rights of association of political parties guaranteed by the State Constitution (art I, §§ 8, 9) and must, therefore, be tested under strict scrutiny (see, Eu v San Francisco Democratic Comm., supra, at 229-231; Tashjian v Republican Party, supra, at 217; Elrod v Burns, supra, at 362; see generally, Berdon, The Constitutional Right of the Political Party to Chart Its Own Course: Defining Its Membership Without State Interference, 22 Suffolk U L Rev 933, 940).
B
In addition to the effect on parties’ fundamental associational rights, the challenged provision limits voters’ choices and, thus, curtails their opportunity to assert their preferences " 'through candidates or parties or both’ ” (Illinois Elections Bd. v Socialist Workers Party, 440 US 173, 184, supra [quoting Lubin v Panish, 415 US 709, 716]). As Justice Marshall emphasized in Illinois Elections Bd. (supra, at 184), by "limiting the choices available to voters, the [government] impairs the voters’ ability to express their political preferences. And for reasons too self-evident to warrant amplification here, * * * voting is of the most fundamental significance *640 under our constitutional structure.” (See also, Tashjian v Republican Party, supra, at 215 [" ' "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents” ’ ”]; Clements v Fashing, 457 US 957, 986, supra [Brennan, J., dissenting] ["the Court has clearly recognized that restrictions on candidacy impinge on First Amendment rights”].) Again, it is no answer to say that the challenged provision expressly affects only candidate requirements. "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation” (Bullock v Carter, 405 US 134, 143, supra).
The voters’ rights here arise not only from article I, §§ 8 and 9 of the State Constitution which safeguard freedoms which would otherwise be protected by the First Amendment (see, supra, at 631-632), but also from article I, § 1 which expressly provides that no "member of this state shall be disenfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land.” From early in our history, the Court has noted that in regulating enfranchisement, the Legislature must do so "subject to and, presumably, in furtherance of the constitutional right and its enactment are to be construed in the broadest spirit of securing to all citizens * * * the right to freely to cast their ballots” (People ex rel. Goring v President & Bd. of Trustees, 144 NY 616, 620-621 [1895]; see, Matter of Crane v Voorhis, 257 NY 298,301 [1931] [the purpose of the Constitution is that " 'all voters shall, so far as the law provides, have equal, easy and unrestricted opportunities to declare their choice for each office’ ”]; Matter of Callaghan v Voorhis, 252 NY 14, 17-18 [1929] [the same]; see also, Green v Shumway, 39 NY 418, 426-427 [1868]).[7]
In sum the undeniable effect of section 2604 (b) (15) is that registered party voters are deprived of their rights (1) to select *641 seven categories of party officials as elected city officers and (2) to choose specified officials as their party leaders. Because section 2604 (b) (15) implicates fundamental rights under article I, §§ 1, 8 and 9 of the State Constitution, the provision must pass strict scrutiny.
II
Defendants contend, however, that even if section 2604 (b) (15) is scrutinized strictly, it should be upheld as serving compelling governmental interests.[8] Without hesitation, they proclaim that in "light of the corruption uncovered in the past five years in New York City it would seem obvious that * * * section 2604(b)(15) furthers compelling governmental interest” (appellant’s reply brief, at 11 [emphasis added]). In a similar vein, amici, under the rubric "Impetus for Ethical Reform” (amici brief, at 12), cite the "constant flow of bribes, PVB contracts and accompanying kickbacks” during the regime of Donald Manes, Borough President of Queens.
From this and the testimony of the sponsors of the legislation (amici brief, at 4-9), it is evident that the purpose of section 2604 (b) (15) is to prevent the corruption which has occurred in the past from occurring again; and the assumption underlying that purpose is that because some politicians have been corrupt in the past, it is likely that some will be corrupt in the future. Whether this premise is based on a proper appraisal of the level of honesty that the city may rightfully expect from its future public officeholders and politicians or one that tends unfairly to stigmatize all politicians as "suspect” because of the past sins of some is not the question. The question is whether this premise is a sufficient justification for the substantial intrusion into the rights of political parties, candidates and voters which section 2604 (b) (15) inflicts.
While some will say, perhaps, that it is unrealistic, even naive to think it, I firmly believe that most public and party officials remain true to their public trust and their oaths of office. Until now, the instruments for rooting out and preventing corruption in public and political office have been found in the polling places, in State and Federal prosecutors’ offices and in the newsrooms of newspapers and television and radio *642 stations. Of course, I recognize the possibility that conflicting interests may tend to effect City officials in performing their public function when such officials maintain strong ties to their parties. To be sure, such officials are obligated to adhere to their oaths of office in face of many other potentially conflicting demands and interests.
The same possibility for conflict may be said to exist in the positions of majority and minority leaders of the Assembly and Senate, positions that are formally recognized by statute and vested with special prerogatives (see, Legislative Law §§ 6, 7). Similarly, at least a potential for conflict is present in the position of Board of Elections member which is constitutionally required to be based upon party representation (NY Const, art II, § 8). Indeed, in the same sense, a potential for conflict is inherent in the very system of electing governmental officials through the partisan political process, for elected officials have an allegiance both to their party and to their constituents. But recognition of the fact that some conflict inheres in the partisan political system does not mean that the system cannot serve the public honestly and effectively; it certainly does not justify the stringent restraints imposed by section 2604 (b) (15) on political parties in fulfilling their important roles in the governmental process.
This statute, which is premised on the notion that major party leaders are not to be trusted to hold high political office, can by no means be viewed as one which is narrowly tailored to accomplish the intended result of preventing corruption (compare, Buckley v Valeo, 424 US 1, 25, 44-48, supra [governmental interest in preventing corruption and the appearance of corruption inadequate to justify certain dollar expenditure limitations]; Dunn v Blumstein, 405 US 330, 353 [waiting period as prerequisite to vote "is not the least restrictive means necessary for preventing fraud”]; see generally, Note, Local Nonpartisan Elections, Political Parties and the First Amendment, 87 Colum L Rev 1677, 1698-1699 [discussing prevention of corruption as insufficient justification for restrictions on political party campaigning in nonpartisan schemes]). Manifestly, means far less drastic than truncating a party’s right to choose its candidates and leaders (in addition to the means already mentioned) are available to further the aim of preventing corruption — for example, Public Officers Law § 73-a (requiring full financial disclosure from high ranking elected and appointed officials) and Public Officers Law § 87 (providing for free access to governmental records).
*643 Corruption in political and public office — as in other segments of our society — unfortunately does exist. It cannot be tolerated and, to be sure, all lawful steps to stop it are required. But it is far better, and unquestionably less harmful, to rely on an alert citizenry, diligent prosecutors and resourceful reporters to combat corruption — in ways which are consistent with our democratic process — than to resort to legislation that strikes at the very heart of the associational freedoms on which the process is based.
I would affirm Supreme Court’s judgment striking down section 2604 (b) (15) as violative of the State Constitution.
Chief Judge Wachtler and Judges Kaye, Alexander and Bellacosa concur with Judge Simons; Judge Hancock, Jr., dissents and votes to affirm in a separate opinion in which Judge Titone concurs.
Judgment reversed, etc.

. "This State has long provided one of the most hospitable climates for the free exchange of ideas. The tradition existed in colonial times, as is exemplified by the acquittal in 1735 of John Peter Zenger” (Matter of Beach v Shanley, 62 NY2d 241, 255 [Wachtler, J., concurring]).

. As we noted in O’Neill v Oakgrove Constr. (71 NY2d 521, 529, n 3) "Article I, § 8 of the Constitution assures, in affirmative terms, the right of our citizens to 'freely speak, write and publish’ and prohibits the use of official authority which acts to 'restrain or abridge the liberty of speech or of the press.’ ”

. Moreover, neither defendants nor amici advance the argument adopted by the majority that the political rights of the parties are not in any way burdened or that the candidates’ and voters’ challenges can be dismissed by simply identifying a governmental interest. Instead, defendants and amici assert that a rational basis test — rather than strict scrutiny — is applicable (see, appellant City’s brief, at 17-29; amici brief, at 31-35).

. In Cousins v Wigoda (419 US 477, 487-488), Justice William Brennan explained the constitutionally protected right of political association in this way: " 'There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity” protected by the First and Fourteenth Amendments. * * * The right to associate with the political party of one’s choice is an integral part of this basic constitutional freedom.’ Kusper v. Pontikes, 414 U. S. 51, 56-57 (1973). 'And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States.’ Williams v. Rhodes, 393 U.S. 23, 30-31 (1968). Moreover, '[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.’ Sweezy v. New Hampshire, 354 U. S. 234, 250 (1957)”. (See also, Berdon, The Constitutional Right of the Political Party to Chart Its Own Course: Defining Its Membership Without State Interference, 22 Suffolk U L Rev 933, 940 [because this associational freedom "is inseparable from at least the fundamental rights of speech and assembly, it is also a fundamental constitutional right”].)

. The freedom of association of political parties is deeply embedded in the constitutional law of our State (see, NY Const, art I, §8 [freedom of speech and press]; art I, § 9 [right to assembly and petition]; see also, Matter of Nicholson v State Commn. on Judicial Conduct, 50 NY2d 597, 607 ["the rights of political expression and association are at the heart of the First Amendment”]). Professor Lawrence Tribe has noted that the associational right is "among the preferred rights derived by implication from First Amendment’s guarantees of speech, press, petition and assembly” (Tribe, American Constitutional Law § 12-26, at 1010 [2d ed 1988]; see also, Starr, The Legal Status of American Political Parties, I, 34 American Political Science Review 439, 442-444 [June 1940] [referring specifically to the rights of free speech and to petition and assembly guaranteed in article I, §§ 8, 9 of *635 the New York State Constitution]). As long ago as 1910, our court recognized the rights of political parties to be free from governmental interference (see, Matter of Callahan, 200 NY 59, 60-61 [invalidating restriction on nominating committee’s right to nominate the candidate of its choice]; see also, Matter of Hopper v Britt, 204 NY 524, 530-532). Moreover, our State Constitution (unlike the Federal Constitution) expressly recognizes the role of political parties in our system of democratic government (see, NY Const, art I, § 1; art II, § 8; see, Starr, op. cit., at 442-443 [the "mere mention of political parties in the State Constitution * * * is probably sufficient to establish them on a firm footing in constitutional law, and to give them a constitutional right to exist”]).

. For example, under section 2604 (b) (15), neither the State nor the national party may choose the Mayor of the City of New York to serve in the important policy-making role of member of the State or national *637 committee, even though it may be in the best interest not only of the party but of the City, State and Nation that the Mayor serve in such position.

. The majority’s reliance on Clements v Fashing (457 US 957) for the proposition that "even broader restraints [than those imposed on judicial officers] would be permissible for elected officeholders, presumably because of their greater powers and responsibilities” (majority opn, at 630) is misplaced. In Clements, the court, in upholding restrictions barring judicial officers from seeking elective office noted the distinction between the duties of Judges and legislators and the extent to which they are prohibited by the nature of their respective offices from making politically motivated decisions. In contrast to Judges who are precluded from making decisions for political reasons, the court noted that "it is to be expected that a legislator will vote with due regard to the views of his constituents” (id., at 968; see, id., at 971).

. Nowhere in the majority opinion is it claimed that the section will survive a strict scrutiny analysis. Indeed, as noted (see, supra, at 633, n 3), the majority takes a position not advanced by defendants or amici: i.e., that no scrutiny of any kind is required.